CONSOLIDATED RAIL CORPORATION,
Petitioner,

v.

SURFACE TRANSPORTATION BOARD,
et al., Respondents,

Commonwealth of Pennsylvania,
et al., Intervenors.

Nos. 95–1312, 95–1353, 95–
1410 and 95–1602.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 15, 1996.

Decided Aug. 20, 1996.

Gerald P. Norton, Washington, DC, with whom Paul A. Cunningham, James M. Guinivan, Washington, DC, Constance L. Abrams and John J. Paylor, Philadelphia, PA, were on the briefs, argued the cause for petitioner. Jonathan M. Broder, Philadelphia, PA, entered an appearance.

Evelyn G. Kitay, Attorney, Surface Transportation Board, Washington, DC, with whom Henri F. Rush, General Counsel, Surface Transportation Board, and Anne K. Bingaman, Assistant Attorney General, United States Department of Justice, John J. Powers III, and John P. Fonte, Attorneys, United States Department of Justice, were on the brief, argued the cause for respondents.

Richard R. Wilson argued the cause and filed the brief for intervenor Northwest Pennsylvania Rail Authority.

Jan M. Tamanini, Assistant Counsel, Harrisburg, PA, filed the brief for intervenor Pennsylvania Department of Transportation.

Before SILBERMAN, BUCKLEY and ROGERS, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

Consolidated Rail Corporation ("Conrail") petitions for review of a series of Interstate Commerce Commission ("ICC" or "Commission") orders reopening an earlier decision that authorized Conrail to abandon a line connecting two Pennsylvania communities and directing the railroad to sell the line to a group of municipalities. The ICC's orders are defended on appeal by the Surface Transportation Board ("STB"), which has assumed the Commission's functions pursuant to the ICC Termination Act of 1995. Because Conrail had satisfied the formal requirements for an abandonment under existing ICC precedent, thereby depriving the ICC of jurisdiction over the line, and because there is no basis for concluding that the abandonment was authorized as a result of mistake, fraud, or ministerial error, we grant the petition and vacate the orders.

## I. BACKGROUND

### A. Regulatory Background

On January 1, 1996, many functions of the ICC, including authority over abandonment proceedings, were transferred to the STB in the Department of Transportation. ICC Termination Act of 1995, Pub.L. No. 104–88, § 201, 109 Stat. 803, 932–34 (1995). In its savings provision, the ICC Termination Act provides that

[t]his Act shall not affect suits commenced before the date of the enactment of this Act. . . . In all such suits, proceeding shall be had, appeals taken, and judgments rendered in the same manner and with the same effect as if this Act had not been enacted.

§ 204(c)(1), 109 Stat. at 942. *See also* H.R. Conf. Rep. No. 422, 104th Cong., 1st Sess. 236–37 (1995); *In re Olympia Holding Corp.,* 88 F.3d 952, 961 n. 23 (11th Cir.1996). Accordingly, for purposes of this appeal, we treat the provisions of the Interstate Commerce Act as they existed prior to the enactment of the ICC Termination Act.

During the times relevant to this appeal, the ICC had, pursuant to the Interstate Commerce Act, exclusive jurisdiction over the construction and operation of virtually all the nation's rail lines. A rail carrier could not be relieved of its legal obligation to provide rail service over a particular line until it had first obtained ICC permission to discontinue or "abandon" service. *See* 49 U.S.C. § 10903(a) (1994). When the carrier had abandoned the line and the ICC had issued an "abandonment certificate," the Commission was generally deemed to have been relieved of its jurisdiction over the line, *see Preseault v. ICC,* 494 U.S. 1, 5 n. 3, 110 S.Ct. 914, 919 n. 3, 108 L.Ed.2d 1 (1990); and the owner was free to "remove the track and dispose of the land," *Illinois Commerce Comm'n v. ICC,* 787 F.2d 616, 620 n. 1 (D.C.Cir.1986).

The ICC had authority over abandonments since 1920. For most of this period, Congress set no time limit for abandonment proceedings. *See Hayfield N. R.R. Co. v. Chicago & N.W. Transp. Co.,* 467 U.S. 622, 628, 104 S.Ct. 2610, 2614, 81 L.Ed.2d 527 (1984). Commentators observed that the Commission "acted as a judicial brake upon possible abandonments." *See* Stephen R. Wild, *A History of Railroad Abandonments,* 23 Transp. L.J. 1, 5 (1995). "Railroads consequently found themselves enmeshed in lengthy proceedings" while awaiting issuance of an abandonment certificate and were thus prevented from "unburden[ing] themselves promptly of unprofitable lines." *Hayfield,* 467 U.S. at 628, 104 S.Ct. at 2614.

In 1976 and 1980, Congress adopted amendments to the Act to facilitate line abandonments by establishing deadlines for processing abandonment applications. *See* Railroad Revitalization and Regulatory Reform Act of 1976 ("4–R Act"), Pub.L. No. 94–

210, § 802, 90 Stat. 31, 127, originally codified at 49 U.S.C. § 1a (1976) (subsequently recodified without substantive change at 49 U.S.C. § 10903 *et seq.* (1994)); Staggers Rail Act of 1980, Pub.L. No. 96–448, § 402, 94 Stat. 1895, 1941–1945, codified at 49 U.S.C. §§ 10903–10906 (1994). As the Supreme Court explained, these amendments were intended to "alleviate the costly delays imposed upon railroads by protracted proceedings before the Commission." *Hayfield,* 467 U.S. at 629, 104 S.Ct. at 2615; *see also Simmons v. ICC,* 775 F.2d 854, 857 (7th Cir.1985) (amendments evinced "the congressional desire to see abandonment proceedings expedited").

The 4–R Act and the Staggers Rail Act created the following guidelines for abandonment proceedings: The Commission determined, within specified time limits following the filing of an application to abandon any part of a railroad line, whether the public convenience and necessity permitted the proposed abandonment. *See generally* 49 U.S.C. §§ 10903, 10904. Upon finding that the public convenience and necessity permitted such an abandonment, the Commission was required, "concurrently with the service of the decision upon the parties, [to] publish the finding in the Federal Register." *Id.* § 10905(c). Within ten days following such publication,

> any person may offer to pay the carrier a subsidy or offer to purchase the line. Such offer shall be filed concurrently with the Commission. If the offer to subsidize or purchase the line is less than the carrier's estimate [of the subsidy or minimum purchase price required to keep the line in operation], the offer shall explain the basis of the disparity, and the manner in which the offer of subsidy or purchase is calculated.

*Id.* If such an offer of financial assistance ("OFA") was made, the ICC, within fifteen days of the publication, determined whether the offeror was financially responsible and the offer satisfied certain financial criteria. If the ICC so found, it postponed the issuance of the abandonment certificate to allow the parties to negotiate the amount of the purchase price or subsidy. *Id.* at § 10905(d).

The parties had 30 days to reach agreement on their own. If they failed to do so, either party could request that the ICC, within 60 days, establish the conditions and amount of compensation. *Id.* at § 10905(e) and (f)(1)(A) & (B).

## B. Factual Background

In June 1994, Conrail requested the ICC's authorization to abandon a rail line between Corry and Meadville, Pennsylvania ("Meadville line" or "line"), where it had estimated losses of $640,000 in 1993. The abandonment application was not protested; and on August 1, 1994, the ICC issued Conrail an abandonment certificate for the line, subject to the filing of an OFA within ten days. Eight days later, a group of municipalities served by the line ("Municipalities") filed an OFA to purchase the line for its $2.9 million net liquidation value. The ICC postponed the issuance of the abandonment certificate to allow the parties to negotiate its sale.

The parties having failed to reach an agreement, the Municipalities requested that the ICC set the terms and conditions for the sale of the line. One of these terms related to the liability for toxic and hazardous substances that might exist along the line. Conrail had proposed terms that limited its liability to actions that occurred during, but not before, it owned and operated the line. The Municipalities objected that, as public bodies, they could not indemnify Conrail for open-ended liabilities that might accrue, under applicable environmental laws, as a result of the presence of such substances along the line before Conrail owned it.

In a decision and order served November 7, 1994, the ICC declined to impose terms relating to environmental liability because it found such provisions to be beyond the standard terms of sale in an OFA proceeding. *Consolidated Rail Corporation—Abandonment—Between Corry and Meadville, in Erie and Crawford Counties, Pa.,* Docket No. AB–167 (Sub–No. 1139), 1994 WL 605848 at *3 ("November 7, 1994 Decision"). The Commission established the line's purchase price as $2.9 million, and it ordered consummation of the sale within 90 days (or by February 6, 1995). *Id.* The Commission

provided that the Municipalities were to produce that amount, and "Conrail shall convey all property by quitclaim deed." *Id.* at *4.

On February 3, 1995, Conrail advised the Municipalities that it had completed preparation of a quitclaim deed and was prepared to proceed to closing. After the Municipalities refused to accept the quitclaim deed, Conrail advised the Commission that no agreement had been reached; and it again requested authorization to abandon the line. On February 8, 1995, the Municipalities opposed Conrail's request for the issuance of an abandonment certificate, arguing that Conrail was "attempt[ing] to impose through its tender of deed the same conditions which the Commission specifically refused to impose on the transaction in its order of November 7, 1994." Reply of the [Municipalities] to the Request of [Conrail] for the Issuance of an Abandonment Certificate, *reprinted in* Joint Appendix ("J.A.") at 148–49.

In a decision and order served on April 17, 1995, the ICC granted Conrail's request for an abandonment certificate. *Consolidated Rail Corporation—Abandonment—Between Corry and Meadville, in Erie and Crawford Counties, Pa.,* Docket No. AB–167 (Sub–No. 1139), 1995 WL 222333 ("April 17, 1995 Decision"). The Commission explained that the Municipalities had misinterpreted its November 7, 1994 Decision. That decision, the Commission noted, "did not say that the purchase agreement for this line could not contain terms relating to environmental liability and indemnification. We said that these terms were beyond the scope of our authority to set terms and conditions in section 10905 and that we would not impose them." April 17, 1995 Decision, 1995 WL 222333 at *2.

Soon thereafter, Conrail began the process of discontinuing service on the Meadville line. On May 1, 1995, the Company canceled tariffs applicable to the line, effective May 12. On May 5, Conrail authorized Allegheny and Eastern Railroad Company ("ALY") to begin track work that would sever the line and allow ALY to provide continuing service to a particular customer at Corry subsequent to Conrail's abandonment. On May 8, Conrail notified shippers that the line would be aban-

doned as of May 12, 1995; and it ceased operations on the line on that date. On May 13, 1995, the Company "began testing its equipment and pulling spikes at Corry in anticipation of further salvage operations which were scheduled to begin on May 15, 1995." Verified Statement of Sandra K. Rhodes, Conrail Manager, Line Sales, *reprinted in* J.A. at 308, 310. ALY severed the line on May 16. *Id.*

Sometime between May 13 and May 17, the Pennsylvania Department of Transportation ("PennDOT") asked Conrail to delay salvage operations; and it then secured a temporary restraining order ("TRO") barring Conrail from removing the track. In addition, PennDOT requested that the ICC reopen the proceedings and stay the effectiveness of the April 17, 1995 Decision. PennDOT claimed that there was a "new bona fide opportunity for Conrail to transfer this track for continued rail service." Letter from Bradley L. Mallory, Pennsylvania Secretary of Transportation, to Vernon A. Williams, Secretary, Interstate Commerce Commission (May 17, 1995), *reprinted in* J.A. at 183.

On May 19, the Chairman of the Commission, acting alone, issued an order staying the abandonment authority granted by the April 17, 1995 Decision and barring Conrail from removing the rail. *Consolidated Rail Corporation—Abandonment—Between Corry and Meadville, in Erie and Crawford Counties, Pa.,* Docket No. AB–167 (Sub–No. 1139) 1995 WL 307741 ("May 19, 1995 Decision"). Both PennDOT and the Municipalities petitioned the ICC to reconsider its April 17, 1994 Decision; and the full Commission, in a decision and order served June 16, 1995, directed Conrail to refrain from removing any track while it considered the matter. *Consolidated Rail Corporation—Abandonment—Between Corry and Meadville, in Erie and Crawford Counties, Pa.,* Docket No. AB–167 (Sub–No. 1139), 1995 WL 361590 ("June 16, 1995 Decision").

One month later, in a decision and order served on July 18, 1995, the ICC executed a *volte face. Consolidated Rail Corporation—Abandonment—Between Corry and Meadville, in Erie and Crawford Counties, Pa.,*

Docket No. AB–167 (Sub–No. 1139) 1995 WL 422154 ("July 18, 1995 Decision"). As an initial matter, the Commission found that because "Conrail has not as yet fully consummated the abandonment . . . we retain jurisdiction over the line." July 18, 1995 Decision, 1995 WL 422154 at *3. The ICC then formally reopened the proceedings. In justifying this action, the Commission asserted (without any citation to the record) that there had been an "outstanding request for clarification" when it had issued the abandonment certificate on April 17, 1994, and that, as a consequence, the certificate had been issued in error. *Id.* at *4. The Commission also stated that "Conrail [could] not require that it be indemnified for any environmental damage that occurred prior to its possession of" the line. *Id.*

Conrail sought an administrative stay pending judicial review of the July 18, 1995 Decision. The ICC denied the request in a decision and order served on October 5, 1995. *Consolidated Rail Corporation—Abandonment—Between Corry and Meadville, in Erie and Crawford Counties, Pa.,* Docket No. AB–167 (Sub–No. 1139), 1995 WL 584438 ("October 5, 1995 Decision"). The Commission stated that

[w]hether a carrier has fully exercised, or consummated, abandonment authority that it has received is . . . not determined by any rigid formula. . . .

While Conrail took the first steps towards abandoning the line by May 12th (discontinuing operations and canceling tariffs), it had not taken any of the further steps associated with a full abandonment of a railroad line (such as salvage) when PennDot filed its petition to reopen and stay Conrail's authority to consummate the abandonment on May 17th.

*Id.* at *5 (citations omitted). The Commission suggested that the fact that Conrail had not begun removing the track or liquidating the infrastructure was evidence that it had not "totally committed itself to abandonment of the line but rather [was] keeping its options open." *Id.* at *6.

In a decision and order served on November 22, 1995, the ICC dismissed Conrail's abandonment application and authorized the transfer of the line from Conrail to the Municipalities. *Consolidated Rail Corporation—Abandonment—Between Corry and Meadville, in Erie and Crawford Counties, Pa.,* Docket No. AB–167 (Sub–No. 1139), 1995 WL 689392 ("November 22, 1995 Decision"). Conrail has since conveyed the line to the Municipalities.

Conrail petitions for review of the Commission's decisions of May 19, June 16, July 18, and November 22, 1995. It argues that because it had abandoned the line prior to the issuance of the May 19, 1995 decision, the line was no longer subject to the Commission's jurisdiction. The STB responds that the Commission was empowered to reopen the proceedings in this case because the abandonment certificate had been erroneously issued; in the alternative, it argues that Conrail had not consummated the abandonment and that the Commission therefore retained jurisdiction over the line.

## II. DISCUSSION

### A. Abandonment

█ The ICC's jurisdiction over a rail line generally ceases once the line has been abandoned pursuant to a valid and effective abandonment certificate. *See Preseault,* 494 U.S. 1, 5 n. 3, 110 S.Ct. 914, 919 n. 3, 108 L.Ed.2d 1 (1990); *Hayfield,* 467 U.S. at 633–34, 104 S.Ct. at 2617–18; *Fritsch v. ICC,* 59 F.3d 248, 253 (D.C.Cir.1995). As the Commission has repeatedly stated, "[w]hether a line is fully abandoned is a question of the carrier's intent." *Iowa Power, Inc.—Construction Exemption—Council Bluffs, IA,* 8 I.C.C.2d 858, 863 (1990); *Illinois Cent. Gulf R.R. Co.—Abandonment—DeWitt and Piatt Counties, IL,* 5 I.C.C.2d 1054, 1061 (1988) ("*ICG*") (same). Here, the Commission asserted that Conrail had not "totally committed itself to abandonment of the line but rather [was] keeping its options open"; as a consequence, because Conrail had not consummated the abandonment, the Commission retained jurisdiction over the line. October 5, 1995 Decision, 1995 WL 584438 at *6–7.

█ In *Iowa Power,* the ICC stated:

The United States Supreme Court has recognized that once a carrier abandons a line pursuant to authority granted by the Commission, the line is no longer part of the national transportation system and Commission jurisdiction generally terminates. *See Presault [Preseault]*, [494 U.S. at 5 n. 3, 110 S.Ct. at 919 n. 3]. Whether a line is fully abandoned is a question of the carrier's intent. In determining intent, we look at certain indicia: a line is fully abandoned when a certificate of public convenience and necessity ... is issued and has become effective, tariffs have been cancelled and operations have ceased. *Black v. ICC*, 762 F.2d 106, 112 (D.C.Cir.1985). Abandonment is considered consummated when a line is fully abandoned. [Citing *ICG*, 5 I.C.C.2d at 1061–62].

8 I.C.C.2d at 863; *see also ICG*, 5 I.C.C.2d at 1061. Each of these indicia are present here. On April 17, 1995, the ICC declared that "[t]he certificate [of public convenience and necessity] ... served August 1, 1994, authorizing Conrail to abandon the ... line ... is effective [immediately]." April 17, 1995 Decision, 1995 WL 222333 at *2. On May 1, Conrail canceled tariffs; on May 8, it notified shippers that operations on the line would be discontinued four days later; and on May 12, it in fact ceased operations. In short, once the abandonment certificate was effective, Conrail promptly and publicly manifested its intention to abandon the line. In fact, Conrail had gone beyond the indicia of intent that the ICC found to be sufficient in *Iowa Power* and *ICG*: it had authorized the severance of the line by ALY on May 16, and had scheduled the commencement of salvage operations on the following day. *See* Verified Statement of Sandra K. Rhodes, *reprinted in* J.A. at 310. Indeed, the Chairman of the Commission was sufficiently satisfied as to the railroad's intent to abandon that she ordered Conrail to refrain from removing track.

In its July 18, 1995 Decision, the Commission cited Conrail's failure to salvage the line as evidence that it had not intended to abandon it. This argument is absurd. Conrail had initiated salvage operations on May 13 and discontinued them when it was under a court order to do so. Conrail's inability to consummate salvage operations does not suggest any uncertainty of purpose on its part; quite the contrary, it reflects the very certainty of purpose that compelled the Penn-DOT to seek a restraining order. Plainly, the Commission cannot cite the court-ordered suspension of salvage operations as evidence of Conrail's lack of intent to complete them.

The ICC has acknowledged that a line may be abandoned even if the track remains in place. In *Consolidated Rail Corp.—Petition for Declaratory Order*, 1 I.C.C.2d 284 (1984), the ICC noted that the railroad had "agreed to forego dismantling" certain lines that had previously been abandoned and that these were "no longer railroad lines recognized by the ICC for jurisdictional purposes" even though Conrail had agreed to resume service over them on a "noncommon carrier" basis. *Id.* at 284. In a more recent decision, the ICC has specifically referred to salvage as *"post-abandonment ... work on the line." Fox Valley & W. Ltd.—Abandonment Exemption—Kewaunee County, WI*, 1994 WL 487579 at *1 (decision served Sept. 12, 1994) (emphasis added). Furthermore, in *Hayfield*, the United States (a respondent in this case) advised the Supreme Court that "[t]ypically, a carrier that abandons a rail line simply leaves in place the track and other permanent facilities that had been used in providing service." Brief for the United States as Amicus Curiae at 14 n.13, *Hayfield* (No. 82–1579) (Aug. 1, 1983).

In its October 5, 1995 Decision, the ICC also suggested that Conrail's failure to notify the Commission that the line had been abandoned was evidence of Conrail's uncertainty of purpose. October 5, 1995 Decision, 1995 WL 584438 at *6. The ICC has repeatedly stated, however, that it no longer requires railroads to file letters confirming an abandonment. *See, e.g., St. Louis S.W. Ry. Co.—Abandonment—In Smith & Cherokee Counties, TX*, 9 I.C.C.2d 406, 410 n. 8 (1992) ("In the past, we routinely imposed [the] requirement[ ] ... that the carrier notify the Commission as to when the abandonment was consummated. *That practice ended in 1984.*") (emphasis added). *See also Winter v. ICC*, 828 F.2d 1320, 1323 n. 9 (8th Cir.1987)

("A letter notifying the Commission of the abandonment is no longer required.").

The STB is free, of course, to change this policy and require railroads to file confirmation letters in the future. (Indeed, the STB has issued a notice of proposed rulemaking in which it would require carriers to file "a notice of consummation, once they intend to fully abandon the line." 61 Fed.Reg. 11174, 11178 (Mar. 19, 1996).). The STB, however, is *not* free to depart from its predecessor's established precedent and thereby upset Conrail's reasonable expectations based on the preexisting practice without an adequate explanation for doing so. *See Hall v. McLaughlin*, 864 F.2d 868, 872 (D.C.Cir. 1989).

In its brief, the STB contends that Conrail's willingness to negotiate a sale of the line while it was in the process of abandoning it is further evidence that Conrail had not, in fact, consummated the abandonment. As an initial matter, the Commission did not make this argument in the decisions under review; and the STB is therefore foreclosed from making it now. *See SEC v. Chenery Corp.*, 318 U.S. 80, 89–95, 63 S.Ct. 454, 460–63, 87 L.Ed. 626 (1943). In any event, the argument is directly contradicted by what the ICC had successfully argued in *Winter*. There, a railroad had filed an abandonment application, received Commission abandonment authorization, cancelled tariffs, and terminated service, as Conrail had here. *Winter*, 828 F.2d at 1321. The ICC and the Eighth Circuit rejected the argument that the railroad's willingness to negotiate with another carrier was extrinsic evidence that it had not consummated abandonment. *Id.* at 1323. In short, the fact that Conrail was still willing to entertain offers for the line does not indicate ambivalence about its intent to abandon it. As the ICC in fact stated in its April 17, 1995 Decision, negotiations for a sale could go forward "*outside* the OFA process," April 17, 1995 Decision, 1995 WL 222333 at *2 (emphasis added), *i.e.*, even if Conrail had abandoned the line.

We note that the decision we reach here is altogether consistent with our recent holding in *Birt v. Surface Transportation Board*, 90 F.3d 580 (D.C.Cir.1996). There, a railroad had discontinued rail service, cancelled its tariffs, and salvaged the line. We nonetheless stated that "conflicting contemporaneous evidence suggesting that the railroad intended to retain control of the line … may properly lead the Board to find that the railroad did not intend to abandon the line." *Birt*, 90 F.3d at 588 n.15. Here, the evidence is overwhelming and uncontradicted: Conrail intended to abandon the line.

Finally, the STB reminds us that it is the Commission's province "to draw legitimate inferences from the evidence" and asserts that, in this case, that evidence supported its finding that a "full abandonment had not occurred." Brief for Respondents at 40. We agree that a court must defer to an agency's factual conclusions where supported by substantial evidence. A reviewing court, however, must "guard against an agency's drawing inferences that are 'arbitrary' in relation to the facts found." *Midtec Paper Corp. v. United States*, 857 F.2d 1487, 1498 (D.C.Cir. 1988). With all respect, in this case, the ICC has chosen to ignore the evidence.

In determining whether a railroad has abandoned a line, one must focus on the railroad's objective intent. Conrail's overt acts made clear beyond cavil that it intended to abandon the line. Conrail having abandoned the line, the Commission lost jurisdiction over it.

**B. Reopening the Proceedings**

Even if Conrail had taken all the steps necessary to abandon the line, the STB argues that the Commission still had the authority to reopen the abandonment proceedings because the abandonment certificate was issued in error. When an "abandonment is approved and has occurred, [the ICC's] jurisdiction remains … [where there has been] fraud, misrepresentation, or ministerial error (e.g., failure to act on a pending petition for reconsideration)." *ICG*, 5 I.C.C.2d at 1063. *See also Busboom Grain Co. v. ICC*, 830 F.2d 74, 76 (7th Cir.1987) ("If the Commission's Secretary forged the Commissioners' signatures to a document authorizing abandonment, the railroad's cessation of service would not prevent the Commission from vacating the order and completing the regu-

lar administrative process.") (Easterbrook, J.).

Here, the STB contends that the abandonment certificate had been erroneously issued because there was an "outstanding request for clarification as to Conrail's right to require that it be indemnified for environmental damage and liability which occurred prior to its possession of the property." July 18 Decision, 1995 WL 422154 at *4. Accordingly, the STB argues that the grant of the abandonment certificate was, in effect, "ultra vires"; and "any steps Conrail took based on the abandonment certificate were taken in reliance on authority that was invalid." Brief for Respondents at 27 n.27. The STB maintains that the Commission was therefore authorized to re-open the proceedings whether or not Conrail had abandoned the line.

■ In support of this position, the STB directs our attention to section 10327 of the Interstate Commerce Act, which provides:

The Commission may, at any time on its own initiative because of *material error, new evidence, or substantially changed circumstances*—

(A) reopen a proceeding;

(B) grant rehearing, reargument, or reconsideration of an action of the Commission; and

(C) change an action of the Commission

49 U.S.C. § 10327(g)(1) (emphasis added). The STB argues that section 10327 authorizes the reopening of abandonment proceedings even after a railroad has consummated the abandonment. Conrail responds that the STB reads section 10327 too broadly. This section, Conrail contends, does not confer jurisdiction; rather, it assumes that the proceeding to be reopened is otherwise within the agency's jurisdiction. In other words, section 10327 does not authorize the ICC to reopen proceedings over which it has lost jurisdiction. We note this dispute between the parties but do not resolve it: even assuming, *arguendo,* that section 10327 empowered the Commission to reclaim jurisdiction over an abandoned line in the event of material error, new evidence, or substantially changed circumstances, we find that the

Commission has failed to demonstrate that any of these factors were present here.

■ The ICC's claimed basis for reopening the case was that there was an "outstanding request for clarification" when it had issued the abandonment certificate. July 18, 1995 Decision, 1995 WL 422154 at *4. We have searched the record for the whereabouts of this "outstanding request for clarification" to no avail. At oral argument, we asked counsel to produce the request for clarification and were directed to page 145 of the Joint Appendix. We found there a five-page document dated February 8, 1995, and entitled "Reply of the [Municipalities] to the Request of [Conrail] for the Issuance of an Abandonment Certificate." As the title suggests, the document is a response to Conrail's February 3 request to abandon the line. The first three-and-a-half pages of the Reply simply recite the facts of the case. The two remaining paragraphs begin with a sentence that would seem out of place in a document purported to be a "request for clarification." The Municipalities state that "[t]he Commission's order of November 7, 1994 is crystal clear." Reply of Municipalities, J.A. at 149. They then proceed to argue that "Conrail was obligated to tender a quitclaim deed conveying 'all property' and nothing else," *id.,* an apparent reference to Conrail's insistence on including a limitation on environmental liability among the terms of the purchase agreement.

It is not hyperbole to describe the Commission's claim of an "outstanding request for clarification" as compounded nonsense. First, there was nothing in the November 7, 1994 Decision that required clarification. As the Municipalities themselves acknowledge, that decision was "crystal clear." The Commission established the purchase price for the line at $2.9 million and directed the parties to negotiate the other terms. Second, there was no "request for clarification"; the document cited by STB's counsel was, as its title proclaimed, a reply to Conrail's request to abandon the line. Third, even if the Municipalities' February 8 reply could be regarded as a "request for clarification," it was not "outstanding" when the Commission issued its April 17, 1995 Decision. In fact, the

agency explicitly considered and rejected the Municipalities' argument, stating that

[t]he Municipalities appear to have misread our November 7 decision. That decision did not say that the purchase agreement for this line could not contain terms relating to environmental liability and indemnification. We said that these terms were beyond the scope of our authority to set terms and conditions in section 10905 and that we would not impose them.

April 17, 1995 Decision, 1995 WL 222333 at *2.

■ In its brief, the STB contends that "[a]nother error justifying reopening was that the $2.9 million purchase price for this line did not include a computation to Conrail for an indemnity from environmental liability." Brief for Respondents at 25. It argues that the Commission would have been obliged to lower the purchase price if Conrail had secured the indemnity provision it sought. While the Commission alluded to this argument in its July 18 Decision, it did not suggest that this or any other "error" presented a ground for reopening the abandonment proceedings. *See* July 18, 1995 Decision, 1995 WL 422154 at *5 n. 5. In addition, we remind the STB that "the power to correct inadvertent ministerial errors may not be used as a guise for changing previous decisions because the wisdom of those decisions appears doubtful...." *American Trucking Ass'ns, Inc. v. Frisco Transp. Co.,* 358 U.S. 133, 146, 79 S.Ct. 170, 177, 3 L.Ed.2d 172 (1958).

### III. CONCLUSION

For the foregoing reasons, we conclude that the ICC was without power to rescind the abandonment of the Meadville line and that it failed to establish any ground for reopening the proceedings. The petition for review is therefore granted and the Commission's decisions of May 19, June 16, July 18, and November 22, 1995, are reversed. On remand, the STB is instructed to order the Municipalities to reconvey the line to Conrail.

*It is so ordered.*