Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

--------

Argued May 21, 2004          Decided July 13, 2004

No. 03-1269

NEW YORK CROSS HARBOR RAILROAD,
PETITIONER

v.

SURFACE TRANSPORTATION BOARD AND
UNITED STATES OF AMERICA,
RESPONDENTS

NEW YORK CITY ECONOMIC DEVELOPMENT CORPORATION
AMERICAN WAREHOUSE, INC., *ET AL.*,
INTERVENORS

--------

On Petition for Review of an Order of the
Surface Transportation Board

--------

*John D. Heffner* argued the cause for the petitioner and intervenors, American Warehouse, Inc. *et al.* *Fritz R. Kahn* and *Thomas F. McFarland, Jr.* were on joint brief.

--------

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Alice C. Saylor*, Attorney, Surface Transportation Board, argued the cause for the respondents. *Robert Hewitt Pate, III*, Assistant Attorney General, *Robert B. Nicholson* and *John P. Fonte*, Attorneys, United State Department of Justice, *Ellen D. Hanson*, General Counsel, and *Craig M. Keats*, Deputy General Counsel, Surface Transportation Board, were on brief.

*Charles A. Spitulnik* was on the brief for intervenor New York City Economic Development Corporation.

Before: GINSBURG, *Chief Judge*, and HENDERSON and ROGERS, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LeCRAFT HENDERSON, *Circuit Judge*: The New York Cross Harbor Railroad (Cross Harbor) and seven of its shipping customers (the intervening shippers)[1] petition for review of the Surface Transportation Board (STB or Board)'s decision to grant the application of the New York City Economic Development Corporation (NYCEDC) for the adverse abandonment of Cross Harbor's rail operations in Brooklyn, New York. *See* 49 U.S.C. § 10903. Cross Harbor claims that the Board acted arbitrarily and capriciously when it failed to explain its departure from precedent denying adverse abandonment applications – applications opposed, rather than sought, by the current rail carrier – and failed to weigh the interests of the shippers against the asserted demands of New York City. We agree and grant the petition.

## I.

Cross Harbor is currently the only rail freight carrier that floats rail cars on barges across New York Harbor. In the Red Hook section of Brooklyn, at a facility known as the Bush Terminal Yards, Cross Harbor operates the 51st Street floatbridge (a dock whence its locomotives move rail cars on

---

[1] These shippers are: American Warehouse, Inc. (Warehouse); Cropsey Scrap Iron and Metal Corp.; Davidson Pipe Supply Co.; Dorann Resources Ltd.; Franklin Poly Corp.; Interdynamics; and Midwood Lumber and Millwork, Inc.

and off the barges) and a series of related railroad tracks, some of which run down the middle of First Avenue. The tracks connect directly to a few local warehouses and with the tracks of other rail carriers, which in turn move the cars either up the east side of the Hudson River or out Long Island. In Jersey City, on the other side of the harbor, Cross Harbor operates another floatbridge and set of tracks that serve other shippers and connect to other rail carriers, which in turn move the cars across the United States.

In 2000, Cross Harbor transported roughly 1600 carloads of "overhead" traffic – cars that do not begin or end their rail service on its Brooklyn tracks – across New York Harbor through the Bush Terminal Yards. It also transported slightly more than 1100 carloads of "local" traffic – cars that either begin or complete their rail service on Cross Harbor's Brooklyn tracks – for the seven intervening shippers. In 2001, however, Warehouse – Cross Harbor's largest local customer – switched facilities in Brooklyn and began receiving service from Cross Harbor not by rail but directly by barge for just shy of 1000 carloads annually. Thus, for the remaining local traffic in Brooklyn, Cross Harbor currently provides rail service directly to the warehouses of four shippers for roughly 100 carloads per year of miscellaneous goods, including plastic pellets, pipes, refrigerant and lumber. It also transports approximately 60 carloads annually for two customers who are not served directly by Cross Harbor's tracks but instead must truck their shipments a few miles to its facilities. Although existing local traffic may be comparatively light, the record indicates that Cross Harbor is successfully pursuing additional local customers, including East Peak Trading Company, and that local traffic is increasing. *See* Joint Appendix (JA) 205, 305.

Cross Harbor operates at the Bush Terminal Yards pursuant to authority from the Interstate Commerce Commission (ICC) in Finance Docket No. 30183, *New York Cross Harbor R.R. Terminal Corp.* – Exemption for Operation and Issuance of Securities (July 15, 1983), now the STB.[2] It does not own

---

[2] In 1995, the Congress revised the Interstate Commerce Act, abolished the ICC, created the STB, transferred the ICC's remain-

the facilities but instead leases them from New York City. Landlord and tenant have had a difficult relationship, however, and in 1998 New York City filed suit against Cross Harbor claiming that the company illegally buried environmentally hazardous materials at the Bush Terminal Yards. In 2000, the City also completed work on its own modern floatbridge facility at 65th Street, a short distance from Cross Harbor's. Cross Harbor has not been able to gain access to the City's floatbridge and continues to operate its own at 51st Street.

In 2001, the City filed suit in state court to evict Cross Harbor from the Bush Terminal Yards. To support this effort, *see* 49 U.S.C. § 10501(b),[3] the NYCEDC also applied to the Board to authorize the adverse abandonment of Cross Harbor's floatbridge and related tracks in Brooklyn pursuant to 49 U.S.C. § 10903. *See Consol. Rail Corp.v. ICC*, 29 F.3d 706, 709–10 (D.C. Cir. 1994) (*Conrail*).[4] NYCEDC asserted three grounds in support of its adverse abandonment application: (1) Cross Harbor's alleged environmental pollution; (2)

ing regulatory authority to it and provided that ICC precedent applies to the STB. ICC Termination Act of 1995, Pub. L. No. 104–88, 109 Stat. 803 (codified in scattered sections in 49 U.S.C.); *see* STB Br. at 3 n.2; *see also Borough of Columbia v. STB*, 342 F.3d 222, 224–25 (3d Cir. 2003).

[3] 49 U.S.C. § 10501(b) provides that "[t]he jurisdiction of the Board" over "transportation by rail carriers" and, among other things, the "abandonment, or discontinuance" of rail "facilities . . . is exclusive [and] the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law."

[4] 49 U.S.C. § 10903(a)(1) provides that "[a] rail carrier providing transportation subject to the jurisdiction of the Board . . . who intends to . . . abandon any part of its railroad lines . . . must file an application . . . with the Board." Any "interest[ed]" party can also initiate an abandonment proceeding – including "adverse" abandonment – under 49 U.S.C. § 10903. *See Thompson v. Texas Mexican Ry. Co.*, 328 U.S. 134, 145 (1946); *Conrail*, 29 F.3d at 710; *Chelsea Prop. Owners – Abandonment*, 8 I.C.C.2d 773, 778 (Aug. 28, 1992), *aff.*, *Conrail*, 29 F.3d at 709.

Cross Harbor's alleged building code violations, including its failure to repair a faulty sprinkler system; and (3) Cross Harbor's history of financial instability. This conduct, NYCEDC claimed, showed that "the public interest is no longer served by [Cross Harbor]'s use of the [t]racks and [f]acilities" at the Bush Terminal Yards. JA 65.

Both Cross Harbor and the intervening shippers opposed NYCEDC's application. Cross Harbor disputed each of NYCEDC's allegations and asserted that new management was improving its performance. It also claimed that NYCEDC sought the adverse abandonment of Cross Harbor's tracks and facilities in order to pursue the City's own undeveloped plan to improve the Brooklyn waterfront. The intervening shippers opposed NYCEDC's application on the ground that abandonment would hurt their businesses.

In reply, NYCEDC acknowledged that it was "conducting planning and design studies for installing or upgrading rail facilities at the City's marine terminals and along First Avenue" and that "[a]pproximately $17 million have been made available for this construction" but asserted that "those plans . . . do not drive [its] actions here." NYCEDC Reply to Protest of Cross Harbor and Intervening Shippers, at JA 135, 138. Instead, the NYCEDC maintained that the City should be able to "evict a tenant whose actions are not in compliance with the obligations that tenant has undertaken" and that abandonment would "not burden interstate commerce." JA 135.

In May 2003, the STB granted NYCEDC's petition. *New York City Econ. Dev. Corp. – Adverse Abandonment – New York Cross Harbor R.R. in Brooklyn, NY*, 2003 WL 21055723 (I.C.C.), at *4 (May 9, 2003) (May Order). After outlining the positions of the parties, the Board noted that the appropriate standard for evaluating any abandonment – whether one initiated by the carrier itself or an adverse abandonment opposed by the carrier – is "whether the present or future [public convenience and necessity] require or permit the proposed abandonment." *Id.* (citing 49 U.S.C. § 10903(d)). The Board was accordingly required "to balance the compet-

ing benefits and burdens of abandonment on all interested parties, including the railroad, the shippers who have used the line, the community involved, and interstate commerce generally." May Order at *4 (citing *City of Cherokee v. ICC*, 727 F.2d 748 (8th Cir. 1984)). The Board then observed that because New York City, "which as a government entity represents all of its citizens, not just the businesses that use [Cross Harbor]'s services[,] . . . has concluded that this property should be put to other public uses," the Board would "not block the City from using its property as it wishes absent an overriding need for the rail service." May Order at *4 (citing *Norfolk & W. Ry. Co. – Aban. Exem. – Cinn., Hamilton County, OH*, 3 S.T.B. 110 (1998)). The Board then found "no overriding public need for the rail service" because "relatively little traffic [uses] this line" and Cross Harbor's customers "will continue to have transportation options," including rail service via tracks that follow the Hudson River to Albany, New York, and thence to all final destinations, and, potentially, the City's own floatbridge. May Order at *4.

Cross Harbor sought to stay the Board's decision and moved for reconsideration. It argued that the Board's decision was contrary to – and failed to adequately explain its departure from – the Board's precedent that adverse abandonment is inappropriate if the carrier is actively operating on the subject tracks. It also claimed the Board had impermissibly shifted the burden of proof to Cross Harbor and failed to articulate the grounds in support of abandonment. In August 2003, the Board granted the stay but denied the motion for reconsideration, iterating that "the public interest does not require that rail service continue over the tracks and facilities at issue" because they are "not heavily used by local traffic" and "the affected shippers will continue to have transportation options." *New York City Econ. Dev. Corp. – Adverse Abandonment – New York Cross Harbor R.R. in Brooklyn, NY*, 2003 WL 22022749 (I.C.C.), at *2 (Aug. 27, 2003) (August Order).

In September 2003, Cross Harbor and the intervening shippers petitioned for review of the Board's August decision. They assert that the STB arbitrarily and capriciously: (1)

failed either to follow or distinguish Board precedent like *Salt Lake City Corp. – Adverse Abandonment – In Salt Lake City, UT*, 2002 WL 368014 (I.C.C.) (Mar. 6, 2002); and (2) failed to balance various interests, as the Board must, before it acted on the abandonment application.

## II.

We give "considerable deference" to the STB's abandonment decisions. *See Chicago v. N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 321 (1981); *Conrail*, 29 F.3d at 710. We will uphold the STB as long as it "engaged in reasoned decisionmaking" and its decision is "adequately explained and supported by the record." *Id.* In short, we review the Board's decision under the Administrative Procedure Act's "arbitrary and capricious" test. 5 U.S.C. § 706(2)(A); *Borough of Columbia*, 342 F.3d at 229; *Cherokee*, 727 F.2d at 751–52 & n.3. An agency acts arbitrarily and capriciously if it "reverse[s] its position in the face of a precedent it has not persuasively distinguished," *Louisiana Pub. Serv. Comm'n v. FERC*, 184 F.3d 892, 897 (D.C. Cir. 1999); *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983) ("An agency's view of what is in the public interest may change, either with or without a change in circumstances. But an agency changing its course must supply a reasoned analysis . . . ." (internal quotation omitted)), and if it fails to "consider[ ] all the relevant factors" in reaching its decision. *N. Mun. Distribs. Group v. FERC*, 165 F.3d 935, 941 (D.C. Cir. 1999); *see Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (agency action "arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem"). Here the STB did both.

For starters, just two years ago, the STB succinctly stated: "Neither the Board, nor the [ICC] before it, has *ever* granted an adverse abandonment when the carrier was operating over the line." *Salt Lake City*, 2002 WL 368014, at *5 (emphasis added). There the STB rejected Salt Lake City's adverse abandonment application because the railroad operated over

the track and thus "there clearly [wa]s a *potential* for contin-ued rail freight service" on the line. *Id.* at \*6 (emphasis added); *see also Conrail*, 29 F.3d at 711 ("Generally, the [ICC] denies an adverse abandonment application if there is *potential* for *future* operation on the [subject] line and the carrier has taken *reasonable steps to attract* traffic." (em-phases added)). In doing so, the Board discussed two earlier decisions involving applications for termination of rail service. *Salt Lake City*, 2002 WL 368014, at \*5–6. The first was *Western Stock Show Ass'n – Abandonment Exemption – in Denver, Co.*, 1 S.T.B. 13, 1996 WL 366394, at \*14–15 (June 12, 1996), in which the STB *denied* a landowner's application for both abandonment of its own tracks and discontinuance of operations over them[5] because, among other reasons, other carriers were "actively operating over the subject lines" and "would be significantly harmed" and because the shipping customers likewise objected. *See also Wisconsin Dep't of Transp. – Abandonment Exemption*, 1988 WL 225048 (I.C.C.), at \*4–6 (Nov. 23, 1988) (rejecting "forced abandon-ment" exemption application of active line where railroad and shipper objected and noting "merits of exemption [applica-tion] would apply to an abandonment application") (*Wis-DOT*).[6] The other was *Modern Handcraft, Inc. – Abandon-ment in Jackson County, MO*, 363 ICC 969, 1981 WL 22670 (I.C.C.), at \*2–3 (Aug. 19, 1981), in which the STB *granted* the abandonment applications of a neighboring landowner and a state transportation authority because it found "a de facto abandonment of the [subject] line ha[d] taken place" in that

---

[5] The "public convenience and necessity" standard applies to both abandonments and discontinuances. 49 U.S.C. § 10903. Abandon-ment allows (or forces) the carrier to cease service and terminates the STB's jurisdiction of the tracks. Discontinuance, meanwhile, allows (or forces) a carrier to cease service but maintains the right-of-way and STB's jurisdiction of the tracks.

[6] A party can also apply for abandonment or discontinuance through the exemption process provided in 49 U.S.C. § 10502, under which the STB is able to "exempt" persons from certain regulations. *See generally Brae Corp. v. United States*, 740 F.2d 1023, 1056–57 (D.C. Cir. 1984); *WisDOT*, 1988 WL 2250048, at \*3–5.

"there ha[d] been no rail operations for over 12 years and no attempt to provide rail service." *See also CSX Corp. & CSX Transp. Inc. – Adverse Abandonment Application*, 2002 STB Lexis 81, at \*14 (Jan. 28, 2002) (granting abandonment where "no [opposing carrier] traffic moving over the line"), *Chelsea Prop. Owners – Abandonment*, 8 I.C.C.2d 773, 1992 WL 233599 (I.C.C.), at \*12 (Aug. 28, 1992) (granting abandonment where tracks had "been out of service for at least 10 years" and there was "essentially no possibility of restoring service").

In the face of this precedent, the STB on reconsideration offered the following:

> [T]he presence of active traffic does not preclude a carrier itself from obtaining abandonment authority, and the statutory standard for authorizing an abandonment, the public convenience and necessity test of 49 U.S.C. [§ ] 10903, as well as the interests to be considered . . . are the same in all abandonment cases, whether adverse or not. While prior adverse abandonment applications that have been granted have involved lines over which no traffic moved, that does not mean that adverse abandonments may not be granted where there is some traffic. The weighing of the relevant interests is an inherently fact-specific process, and there is no impediment to authorizing an adverse abandonment of an active line where, as here, the situation warrants such action.

August Order at \*2 (footnote omitted). Nowhere did the Board distinguish the earlier – and uniform – adverse abandonment precedent; rather, in a footnote, it relied solely on the non-adverse abandonment precedent cited in the May Order. *See* August Order at \*2 n.7; May Order at \*4 n.14 (citing *City of Cherokee*, 727 F.2d at 748; *Missouri Pacific R. Co. v. ICC*, 625 F.2d 178 (8th Cir. 1980); *Marshall Durbin Food Corp. v. ICC*, 959 F.2d 915 (11th Cir. 1992)). The Board's brief, generalized statement fails to provide an "adequate explanation" to allow the STB to ignore factors and reasoning it has previously – and consistently – found controlling. *Consol. Rail Corp. v. STB*, 93 F.3d 793, 799 (D.C. Cir.

1996); *see Ramaprakash v. FAA*, 346 F.3d 1121, 1125 (D.C. Cir. 2003) ("An agency's failure to come to grips with conflicting precedent constitutes 'an inexcusable departure from the essential requirement of reasoned decision making.' ") (quoting *Columbia Broad. Sys. v. FCC*, 454 F.2d 1018, 1027 (D.C. Cir. 1971)); *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970) (agency must supply "reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored").[7] This failure was itself arbitrary and capricious.

In the May Order, the STB stated that evaluating the "public convenience and necessity" means considering "the competing benefits and burdens of abandonment on all interested parties, including the railroad, the shippers who have used the line, the community involved, and interstate commerce generally." May Order at \*4 (citing *Cherokee*, 727 F.2d at 748); *see also* August Order at \*2 ("Board weighs the relative burdens that continuing or ceasing rail service would have on all of the potentially affected interests, including the railroad, the owners of the property (if different from the carrier), shippers, the national rail network, and the broader public"). There are thus articulated at least four interests to balance: (1) the railroad; (2) the owner and/or the public; (3) the shippers; and (4) interstate commerce and the rail system in general. *See Cherokee*, 727 F.2d at 751 (public convenience and necessity "standard requires the Commission to balance the respective interests of the carrier, protesting communities and shippers, and interstate commerce generally"); *see also Colorado v. United States*, 271 U.S. 153, 168–69 (1966) ("The benefit to one of the abandonment must be weighed against

---

[7] Before us, the Board resurrects *State of Oklahoma ex. rel Dep't of Highways, Abandonment and Construction*, 324 I.C.C. 666 (Oct. 29, 1965) – a decision not mentioned by the Board below – to support the notion that *Salt Lake*'s prohibition against adverse abandonment of active track with active shippers was "an overstatement." *See* STB Br. at 19 & n.17. In *Oklahoma*, however, none of the protesting shippers was deprived of direct rail service and the ICC required other connecting tracks to be constructed as an offset to the protesting carrier. *See* 324 I.C.C. at 675–78.

the inconvenience and loss to which the other will thereby be subjected. Conversely, the benefits to particular communities and commerce of continued operation must be weighed against the burden thereby imposed upon other commerce . . . . In many cases, it is clear that the extent of the whole traffic, the degree of dependence of the communities directly affected upon the particular means of transportation, and other attendant conditions, are such that the carrier may not justly be required to continue to bear the financial loss necessarily entailed by operation . . . . Whatever the precise nature of these conflicting needs, the determination is made upon a balancing of the respective interests – the effort being to decide what fairness to all concerned demands.") Here, however, the STB ignored Cross Harbor's interest, accepted – as the petitioners argue, "hook, line, and sinker" – the interest of the community and neglected the interests of the shippers and of interstate commerce in general. The Board's failure to balance the competing interests thus independently requires us to vacate and remand the Board's decision.

First, the STB apparently overlooked Cross Harbor's interest. Cross Harbor believes its interest lies in continued service at the Bush Terminal Yards and contends "the abandonment would effectively 'cut the guts' out of [its] operation." Pet'r's Reply Br. at 11. In *Salt Lake* – again, an adverse abandonment application – the objecting carrier's interest was significant and the Board declined to "substitute [its] judgment" for the carrier's "business judgment" once the carrier had decided to reactivate service on the line. 2002 WL 368014, at *6. Here, however, the Board relied on non-adverse abandonment precedent to justify abandonment of Cross Harbor's active service in Brooklyn. *See* August Order at *2 ("[T]he presence of active traffic does not preclude a carrier itself from obtaining abandonment authority . . . [and] the interests to be considered . . . are the same in all abandonment cases, whether adverse or not." (footnote citing to non-adverse abandonment precedent omitted)). The Board's reliance on non-adverse abandonment precedent here manifests its error. In a non-adverse abandonment, the petitioning railroad's interest as well as the current and projected

profitability of the line are routinely considered. *See, e.g., Marshall Durbin*, 959 F.2d at 921 ("Among the factors the [ICC] considers [in a non-adverse abandonment] are the avoidable loss on the line, opportunity costs suffered through operation of the line, any necessary rehabilitation expenses, the prospects for future profitability, and whether the affected shippers have practical transportation alternatives."); *Cherokee*, 727 F.3d at 752 (abandonment decision weighs "annual operating losses, coupled with necessary rehabilitation expenses on the line"); *Missouri Pacific*, 625 F.2d at 180–83 ("traditional factors" in abandonment include "profitability, maintenance and rehabilitation" but Commission should also look to "the impact of opportunity costs on interstate commerce"). Cross Harbor's interest makes no appearance in the Board's decision.

In addition, the Board improperly elevated to premier status the interest of New York City. In its view:

> This property is owned by the City, which as a government entity represents all of its citizens, not just the businesses that use [Cross Harbor]'s services. The *City has concluded* that this property should be put to other public uses, and *we will not block the City* from using its property as it wishes *absent an overriding need* for the rail service.

May Order at *4 (emphases added). First, this statement is contrary to Board precedent. The STB does not, and cannot, simply accede to a public entity's wishes in an abandonment proceeding; instead it weighs that interest as "only one factor in [its] analysis." *Salt Lake City*, 2002 WL 368014, at *7; *see Chelsea*, 8 I.C.C.2d at 779 ("The impediments to State and local government projects, although entitled to some weight, are nevertheless required to give way to our statutory duty to preserve and promote continued rail service, where the carrier has expressed a desire to continue operations and has taken reasonable steps to acquire traffic."); *WisDOT*, 1988 WL 225048, at *5 (state transportation agency's opinion "entitled to respect" but Board must nonetheless "weigh that argument" against national interests in "development and

continuation of a sound rail transportation system"). In *Norfolk & Western Railway Company – Abandonment Exemption*, 3 S.T.B 110, 1998 STB Lexis 126, at \*21–22 (May 13, 1998) – the decision relied upon by the Board for its statement that there must be an "overriding need for rail service" – the Board expressly found "no overriding public need" in maintaining a set of tracks (unused for 11 years) outweighed the state's interest in conducting a "nearly $1 billion" overhaul of Cincinnati's central business district, which included, among other things, a new football stadium, entertainment center and the "National Underground Railroad Freedom Center." *See Fore River RR. Corp. – Discontinuance of Service Exemption – Norfolk County, MA*, 8 I.C.C.2d 307, 311 (Mar. 10, 1992) (successful applicant for adverse discontinuance "*established* a consistent pattern of [the carrier] failing to meet its obligations to its shippers, its employees and its lessor" (emphasis added)); *see also WisDOT*, 1988 WL 225048, at \*5 (Board does "not simply weigh the dollars to be expended [by city] in building an overpass against the dollars of revenue (present or future) lost by [active carrier], or the increased costs experienced by shippers who lose rail service"); *Modern Handcraft*, 363 I.C.C. at 972 (adverse abandonment proper where line not in use for over 12 years and applicant "has been trying for years to acquire the line because the line is suitable for an urban transit system"). But here the NYCEDC has merely asserted an undefined "plan to redevelop the waterfront area" – a plan only referenced in a footnote in the Board's decision on reconsideration. *See* August Order at \*2 & n.5. Moreover, the NYCEDC claimed the plan was not the basis of its application. *See* JA 135 ("NYCEDC does not deny that it plans 'to redevelop and expand marine terminals and reconfigure the subject rail facilities to accommodate those changes.' Those plans, however, do not drive NYCEDC's actions here." (quoting Protest of Cross Harbor 13, at JA 111)).

More importantly, the STB itself–not New York City – is to determine the "public convenience and necessity." *See Salt Lake City,* 2002 WL 368014, at \*7 (rejecting city's claim of "no doubt where the interests of the public lie" simply

because city represented "interest of the entire public, not just the interests of [the objecting railroad] and its shippers"). Yet that is not what happened here: here the Board in effect said, "the City says abandonment is in the public interest, and therefore it is." *See* May Order at *4 ("The City has concluded that this property should be put to other public uses, and we will not block the City from using its property as it wishes absent an overriding need for the rail service."). But "only if *the Board* finds" – after balancing all of the relevant interests – "that the present or future public convenience and necessity require or permit the abandonment" may an abandonment application be granted. 49 U.S.C. § 10903(d); *see Conrail*, 29 F.3d at 710; *Cherokee*, 727 F.2d at 751. Indeed, in deciding an adverse abandonment or discontinuance application by a *private* entity, the STB analyzes the applicant's asserted interests and the record and makes its own findings regarding the public interest. *See, e.g.*, *CSX Corp. and CSX Transp. Inc.*, 2002 STB Lexis 81, at *12–15 (explaining that abandonment "will benefit the public" because "it will result in improved rail service by CSX," including reducing costs and delays, improving access to other rail facilities and generally allowing for "more fluid and efficient rail operation in . . . Chicago"); *Fore River*, 8 I.C.C.2d at 311 ("Fore River's operations have become a significant burden on the public, on the owner, and on labor. In sum, they have become a burden on interstate commerce. Accordingly, the evidence of record demonstrates that it is in the public interest and in the interest of interstate commerce to permit [adverse discontinuance]."). The Board cannot abdicate its responsibility to make an independent assessment of the relevant factors whether the applicant be private or public.

In addition, by requiring an "*overriding* need" for rail service to supersede the NYCEDC's interest, the Board shifted the burden to the objecting carrier to come forward with sufficient evidence of hardship or harm. May Order at *4 (emphasis added); *see also* August Order at *3 (shippers "assert that use of trucks would be economically infeasible . . . [but] *they offered no support* to substantiate these claims and there is *no reason to believe* that these transportation

alternatives, although they may be somewhat less convenient and/or more costly, would not meet these shippers' needs" (emphases added)). In *Salt Lake City*, however, the Board cautioned against such a shift: there the Board described Salt Lake City's claim that *it* embodied the public interest and that the objecting railroad and shippers had to adduce evidence about the market and alternative routes as an impermissible "attempt to shift the burden to the railroad" which was "contrary to the statute and case law interpreting it." 2002 WL 368014, at *7. Moreover, the decision the STB relied on for its "overriding need for the rail service" language (*Norfolk & Western Railway*) is hardly analogous. May Order at *3. In *Norfolk & Western Railway*, as earlier discussed, the objecting carriers had not used the line for over eleven years and were instead obstructing several riverfront revitalization projects worth nearly $1 billion. 1998 STB Lexis 126, at *21–22.

*Norfolk & Western Railway* also suggests the Board improperly evaluated the interests of the shippers. There the Board succinctly noted: "*No shipper will lose rail service as a result of the abandonment.*" *Id.* at *22 (emphasis added); *see CSX Corp.*, 2002 STB Lexis 81, at *14 ("No shippers have protested this application. Moreover, shippers will not lose routing options or have less efficient, more costly service if [the carrier] is forced to abandon its trackage."); *see also Chelsea*, 8 I.C.C.2d at 791 (noting "absence of future traffic prospects" in permitting abandonment); *Modern Handcraft*, 363 I.C.C. at 971 (noting only objection "comes from the carrier itself" – not from shippers – and lack of "any serious effort on the part of [the carrier] to solicit traffic or reinstitute rail service"). Indeed, the Board has regularly used either objections from the active railway's shippers or the "potential for continued rail freight service" – i.e., potential future shippers – to reject adverse abandonment applications. *See, e.g., Salt Lake City*, 2002 WL 368014, at *6.[8] In *Western*

[8] The STB authorized adverse discontinuance of an active carrier's lease in *Fore River* with the blessing of the carrier's active shipping customers: "The only two shippers on the line support

*Stock*, the STB denied an adverse abandonment application regarding active trackage because the shippers "express[ed] satisfaction with the service they have been receiving, promise[d] continuing and increasing use of the carrier, and complain[ed] of the expense and unsuitability of the alternative of motor carrier service." 1996 WL 355394, at *15. Indeed, in *WisDOT*, the Board noted that to authorize the abandonment, thereby severing the rail service of the one affected shipper, would undercut its goal of promoting competition between rail and trucking services. 1988 WL 225048, at *5.

In contrast to the Board's overall inattentiveness to the interests of the objecting shippers here is its recent decision in *Waterloo Railway Company – Adverse Abandonment*, 2004 WL 941227 (I.C.C.), at *3 (April 30, 2004). There the Board denied an adverse abandonment application by the bankruptcy trustee of the owner of a rail line seeking to avoid its agreement with a carrier actively operating on the line. The Board did so principally to prevent the line's one shipping customer from losing competitive rail service. *Id.* at *3–4. The Board observed:

> Because of the strong statutory and Board policies favoring the preservation of rail-to-rail competition and *the provision of adequate service for shippers*, the Board will not deprive [shipper] of the availability of *rail service options that it already has* absent a *very strong showing* that such action is in the public interest. In particular, the [trustee] has the burden of proving that the benefit of the existing competitive service option available to the [shipper] from [the active carrier] is outweighed by other harms.

*Id.* at *4 (emphases added). The Board rejected the trustee's argument that the availability of alternative but less convenient and more expensive truck and railway service was

---

discontinuance. Fore River has established a consistent pattern of failing to meet its obligations to its shippers...." 8 I.C.C.2d at 311.

sufficient to overcome the shipper's interest in maintaining the rail line. *Id.*

In this case, seven active shippers oppose the abandonment and eight active shippers will lose Cross Harbor's services in Brooklyn.[9] Five active shippers (again, unlike the shippers in *Oklahoma*, *see supra* note 7) will lose *direct* connection to rail service. Yet the Board simply observed that "the shippers will continue to have transportation options," pointing to the circuitous – and more costly – rail service up the Hudson River and the potential availability of the City's own float-bridge. May Order at *4. Especially in light of consistent precedent to the contrary, the Board must reconsider its dismissive treatment of the shippers' interests.

Finally, the STB neglected to mention its "statutory duty to preserve and promote continued rail service," *Western Stock*, 1996 WL 366394, *12; *see Salt Lake City*, 2002 WL 368014 at *4; *Chelsea*, 8 I.C.C.2d at 779; and, specifically in the context of the "abandonments or discontinuance of rail service," that one of its "function[s] . . . is to provide the public with a degree of protection against the unnecessary discontinuance, cessation, interruption, or obstruction of available rail service." *Waterloo Ry.*, 2004 WL 941227, at *3; *see Western Stock*, 1996 WL 366394, at *12; *Modern Handcraft*, 363 I.C.C. at 972.[10] The Board failed to assess the abandonment's impact on rail service or on interstate commerce generally. Would Cross Harbor continue to operate its car float service from Jersey City, New Jersey without its facili-

---

[9] At oral argument, Cross Harbor's counsel stated that if abandonment occurs, Cross Harbor will not be able to continue barge service to Warehouse's Brooklyn facility and Cross Harbor's new Brooklyn shipping customer, East Peak Trading Company – the eighth shipper – will also lose direct rail service.

[10] Cross Harbor and the intervening shippers do not contend that there is a statutory presumption in favor of maintaining rail service. *But see* 49 U.S.C. §§ 10101(1), (4),(5), 10904, 10905; *Conrail*, 29 F.3d at 712 ("More to the point, it is clear that the aim of section 10905 is not simply the maintenance of rail *lines* but the continuation of rail *service*." (emphasis in original)).

ties in Brooklyn? If not, what effect would its demise have on rail freight service in and around New York City? Is a rail trip to Albany, New York economically and competitively viable for Cross Harbor's overhead traffic? Can the rail system support it? If not, could, or should, the Verrazano–Narrows and Triborough Bridges, to name just two non-rail routes, support additional truck traffic? And at what additional cost to current and future shippers? The STB dismissed questions like these by observing that "the shippers located along the tracks and facilities at issue have other transportation options, and the line's overhead rail traffic can be rerouted." August Order at *3. But this is no answer because shippers can usually find other options and traffic can generally be rerouted and yet competition – both rail-to-rail and rail-to-other transportation modes – may suffer. *Cf. Waterloo Ry.*, 2004 WL 941227, at *4 ("The burden to show that the Board should extinguish competition where it already exists is a difficult one to meet because the Board is guided by its governing statutes and policies, which make competition important."). The Board failed to explain what effect its action will have on shippers' options and competition generally.

In sum, the Board failed to distinguish its adverse abandonment precedent and to properly balance all of the competing interests involved in the abandonment application. In each respect, it acted arbitrarily and capriciously in granting NY-CEDC's abandonment application. Accordingly, we grant Cross Harbor's petition for review and remand the matter to the Board.

## III.

For the foregoing reasons, the Surface Transportation Board's decision granting New York City Economic Development Corporation's abandonment application is vacated and the matter is remanded to the Board for further consideration in light of this opinion.

*So ordered.*