**BURLINGTON NORTHERN RAILROAD COMPANY, Petitioner,**

v.

**SURFACE TRANSPORTATION BOARD and United States of America, Respondents.**

**West Texas Utilities Company, Intervenor.**

No. 96–1229.

United States Court of Appeals, District of Columbia Circuit.

Argued March 18, 1997.

Decided May 23, 1997.

Samuel M. Sipe, Jr., Washington, DC, argued the cause for petitioner. With him on the brief were John D. Graubert, Carolyn Doozan Clayton, Washington, DC, Richard E. Weicher, Schaumburg, IL, and Michael E. Roper, Fort Worth, TX.

Thomas J. Stilling, Attorney, Surface Transportation Board, Washington, DC, argued the cause for respondents. With him on the brief were Henri F. Rush, General Counsel, Ellen D. Hanson, Deputy General Counsel, Craig M. Keats, Associate General Counsel, and Joel I. Klein, Acting Assistant Attorney General, U.S. Department of Justice, John J. Powers III and John P. Fonte, Attorneys.

Kelvin J. Dowd, Washington, DC, argued the cause for intervenor. With him on the brief were William L. Slover and Frank J. Pergolizzi. Andrew B. Kolesar III entered an appearance.

Before RANDOLPH and TATEL, Circuit Judges, and BUCKLEY, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

Petitioner, Burlington Northern Railroad Company, challenges a Surface Transportation Board decision finding the railroad's common carrier rate for coal transport from a Wyoming mine to a Texas power plant unreasonable and ordering the rate substantially lowered. Rejecting Burlington Northern's argument that the Board's decision is invalid because a rate filing was ordered prematurely and finding substantial evidence that the railroad dominated the market for the complaining utility's coal shipments, we conclude that the Board properly exercised its statutory authority to review Burlington Northern's rate. We also uphold the Board's determination that the rate was unreasonably high, finding that its application of a standalone cost constraint—designed to limit monopoly pricing—was both methodologically sound and supported by substantial evidence. Finally, we reject Burlington Northern's contention that the Board impermissibly prescribed the rate's terms of service. Accordingly, we deny the petition for review.

I

Beginning in 1986, Burlington Northern transported coal from the Rawhide mine in Wyoming's Powder River Basin to intervenor West Texas Utilities Company's (WTU) Oklaunion generating station in Vernon, Texas. Anticipating expiration of its contract with Burlington Northern, WTU filed a complaint with the Interstate Commerce Commission in January 1994, asking the Commission to order Burlington Northern to publish a tariff for common carrier service on the Rawhide–Oklaunion route. After the Commission issued the requested order in August 1994, Burlington Northern filed a tariff setting the rate for coal transport at $19.36 per ton. Arguing that the Commission lacked authority to require a tariff filing prior to the expiration of WTU's contract, Burlington North-

ern petitioned this Court for review of the filing order.

Several months later, in November 1994, WTU amended its complaint before the Commission to allege that Burlington Northern's proposed rate was unreasonably high, prompting the Commission to initiate proceedings to review the tariff. After the parties submitted their final briefs to the Commission in September 1995, WTU's contract with Burlington Northern expired and its traffic began moving at the disputed common carrier rate. In February 1996, while a decision in the rate proceeding was pending, this Court granted Burlington Northern's petition for review of the August 1994 filing order, holding that the Commission lacked authority to require Burlington Northern to publish a tariff because, at the time of the order, WTU's traffic was still moving under contract. *Burlington Northern R.R. v. Surface Transp. Bd.*, 75 F.3d 685 (D.C.Cir.1996).

Inheriting the case from the Commission but applying the law in effect prior to the ICC Termination Act of 1995, Pub.L. No. 104–88, 109 Stat. 803 (1995), the Surface Transportation Board ruled on WTU's complaint in April 1996. *West Texas Util. Co. v. Burlington Northern R.R.*, No. 41191, 1996 WL 223724 (S.T.B. April 25, 1996). After concluding that this court's earlier decision did not preclude review of a tariff then in use, the Board asserted jurisdiction to determine the reasonableness of Burlington Northern's rate based on the Board's finding that the railroad had "market dominance" over WTU's traffic. *See* 49 U.S.C. §§ 10701a(b)(1), 10709 (1994). Applying the stand-alone cost constraint established in the Commission's *Coal Rate Guidelines*, 1 I.C.C.2d 520, 542 (1985), *aff'd sub nom. Consolidated Rail Corp. v. United States*, 812 F.2d 1444 (3d Cir.1987), the Board found that the published rate was unreasonably high. Because the parties' competing methodologies for setting WTU's rate based on the Board's stand-alone cost analysis each yielded a rate below 180 percent of Burlington Northern's variable costs, the Board's jurisdictional threshold, *see* 49 U.S.C. § 10709(d)(2), the Board ordered Burlington Northern to establish a rate at the jurisdic-

tional level—$13.68 per ton—and pay WTU reparations for earlier overcharges.

After the Board denied Burlington Northern's petition to reopen, the railroad filed this petition for review. Burlington Northern argues that the Board's decision is invalid because the Commission initiated the rate proceeding prematurely. It also argues that the Board's market dominance determination and parts of its stand-alone cost analysis are either unsupported by substantial evidence or conceptually flawed, and that the Board improperly dictated Burlington Northern's terms of service under the disputed rate.

 We will set aside a Board decision only if it is "arbitrary, capricious, an abuse of discretion, . . . otherwise [unlawful], . . . or unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E) (1994); *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43–44, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983). Because Congress has expressly delegated to the Board responsibility for determining whether a railroad has market dominance and, if so, whether its rate is reasonable, the Board " 'is at the zenith of its powers' " when it exercises that authority, *Central & S. Motor Freight Tariff Ass'n v. United States*, 777 F.2d 722, 729 (D.C.Cir.1985) (quoting *American Trucking Ass'ns v. United States*, 627 F.2d 1313, 1320 (D.C.Cir.1980)), and therefore entitled to particular deference. So long as Board findings rest on " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' " *Consolo v. FMC*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)), and the agency has articulated a " 'rational connection between the facts found and the [decision] made,' " *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)), we must leave the Board's judgment undisturbed: *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971) ("The court is not

empowered to substitute its judgment for that of the agency."). Applying these standards, we consider each of Burlington Northern's arguments in turn.

## II

■ Burlington Northern first contends that we must vacate the Board's order in light of our earlier ruling that the Commission had no authority to issue a filing order before WTU's contract expired. Conceding that the Board had jurisdiction over the tariff after WTU's traffic began moving at the common carrier rate, Burlington Northern argues that the Board should nevertheless have dismissed the rate proceeding after our ruling because the Commission purportedly lacked jurisdiction over WTU's amended complaint when filed. The cases on which Burlington relies for this proposition, however, concern our jurisdiction to hear prematurely filed appeals from agency decisions, *see, e.g., TeleSTAR, Inc. v. FCC,* 888 F.2d 132, 134 (D.C.Cir.1989), not an agency's jurisdiction to rule on prematurely filed complaints. Finding nothing in our *Burlington Northern* decision to suggest that the Board's jurisdiction over the filed rate was compromised by the Commission's earlier error, we see no reason to upset the Board's determination to go forward with the rate proceeding, particularly since Burlington Northern chose not to question the Board's jurisdiction based on our decision until after the agency ruled against it. Although Burlington Northern argues that the timing of the Board's review prevented it from submitting new evidence in support of its rate, the railroad remains free, now or in the future, to urge the Board to reopen its proceedings to consider such evidence. *See* 49 U.S.C.A. § 722(c) (1997).

## III

■ Burlington Northern next challenges the Board's determination that the railroad had market dominance over WTU's coal shipments from the Rawhide mine to the Oklaunion generating station. A prerequisite to the Board's jurisdiction, *see* 49 U.S.C. §§ 10701a(b)(1), 10709, "market dominance" means "an absence of effective competition ... for the transportation to which a rate applies." *Id.* § 10709(a). Finding substantial evidence in the record to support the Board's market dominance determination, we agree with the Board that it had jurisdiction to consider the reasonableness of Burlington Northern's rate.

■ Under its long-term supply contract, WTU must purchase more than two million tons of "base load" coal per year from the Rawhide mine, two-thirds of Oklaunion's total fuel requirement. As the only railroad with a rail line at each end of the Rawhide–Oklaunion route, Burlington Northern acts as a "bottleneck carrier" for WTU's traffic at both its origin and destination. *See Consolidated Papers, Inc. v. CNW Transp. Co.,* 7 I.C.C.2d 330, 338–39 (1991) (defining "bottleneck carrier"). Because a bottleneck carrier is "a necessary participant in all available routes, ... it can usually control the overall rate sufficiently to preclude effective competition." *Id.* at 339.

Notwithstanding its position as a bottleneck carrier, Burlington Northern argues that earlier rate reductions it gave WTU and public statements by WTU officials demonstrate that the utility, by threatening to build a rail spur connecting Oklaunion to a competing carrier, had successfully disciplined the railroad's pricing. We think the Board reasonably concluded that the prospect of intramodal competition at Oklaunion was insufficient to cabin Burlington Northern's rates for the traffic at issue—shipments from the Rawhide mine—because Burlington Northern would remain the bottleneck carrier at the traffic's origin even if WTU built a spur. As the Board found from the evidence, construction of a spur, costing about $70 million, would be economically unfeasible and therefore not a credible threat; it would result only in competition for shipment of Oklaunion's incremental coal requirements, which WTU remained free to purchase from other mines. Testimony that Burlington Northern reduced its rates only when threatened with litigation, and that even the reduced rates were nearly double those prevailing in markets served by more than one railroad, further support the Board's determination that Burlington Northern's price concessions did

not prove the existence of effective competition.

Burlington Northern also contends that WTU could combat the railroad's bottleneck control by threatening to serve Oklaunion's market with electricity from other generating stations, thereby reducing or eliminating Oklaunion's need for coal shipments. But the record supports the Board's conclusion that cutting generation at Oklaunion, WTU's lowest-cost station, was equally unfeasible. According to WTU's evidence, such a strategy would require the utility to replace the station's output with electricity from more expensive sources and, if minimum coal tonnages were not taken from the Rawhide mine, would result in significant penalties under WTU's coal supply contract. Although contract penalties would not occur unless WTU reduced its coal purchases by more than one-third, the Board found that Burlington Northern could recoup profits on lost incremental coal traffic by charging higher rates on the "base load" shipments that WTU was obligated to purchase from the mine.

In short, the Board considered Burlington Northern's evidence of competition for WTU's traffic, reasonably rejecting it on the basis of substantial evidence that WTU could not effectively circumvent the railroad's bottleneck control over access to the Rawhide mine, the source from which WTU had to purchase most of its coal.

IV

We next address the Board's application of the Coal Rate Guidelines' stand-alone cost constraint. Designed to test the reasonableness of railroad rates, the constraint requires that a carrier's rates may not exceed the rates a hypothetical "stand-alone railroad" would have to charge in order to recover the costs of building a rail system to carry the complaining shipper's traffic and earn a reasonable return. See Bituminous Coal—Hiawatha, Utah to Moapa, Nevada, 10 I.C.C.2d 259, 259 n. 5 (1994) (Nevada Power); Coal Rate Guidelines, 1 I.C.C.2d at 542–46. Presenting its case to the Board, WTU posited that a hypothetical railroad built to transport coal from the Powder Riv-

er Basin to eleven utilities served under Burlington Northern's contracts could carry WTU's traffic at a rate substantially lower than Burlington Northern's published tariff. From conflicting evidence presented by Burlington Northern and WTU, the Board estimated capital costs, operating expenses, traffic volumes, and revenues that the hypothetical railroad could expect over twenty years of operations commencing in 1995. Discounting future cash flows to present value, the Board determined that, at Burlington Northern's current rates, the hypothetical carrier's expected revenues over the analysis period would exceed its costs plus a reasonable return by more than $1 billion, and that Burlington Northern's rates were therefore too high.

Burlington Northern raises three objections to the Board's stand-alone cost analysis: that the Board overestimated the revenues that the hypothetical carrier could earn serving the utilities on its route; that the Board underestimated the hypothetical carrier's capital requirements by treating land assemblage and grade-crossing costs as excludable barriers to entry; and that the Board should have projected the hypothetical carrier's revenues and costs in perpetuity, instead of relying on a "modified perpetuity" model that limited projections to twenty years of operations. We consider each claim in turn.

*Revenue Estimates*

Consistent with the Commission's past practice, the Board assumed, without objection from Burlington Northern, that the hypothetical carrier would "step into Burlington Northern's shoes" when it commenced operations in 1995, carrying all eleven utilities' coal traffic at Burlington Northern's contract rates. Estimating the hypothetical carrier's revenues for the remaining nineteen years of the analysis period, however, required the Board to project how the railroad's traffic volumes and rates might change over time. With respect to traffic volumes, the Board made two projections: that coal shipments would grow at rates derived from Burlington Northern's 1994–97 regional traffic report, with shipments capped when utilities reached 85 percent of

their operating capacities; and that the hypothetical carrier would retain all the utilities' traffic throughout the analysis period. With respect to contract rates, the Board estimated that the hypothetical carrier, reflecting the current level of inflation in railroad industry costs, would raise its rates 2.8 percent per year.

■ Burlington Northern begins by claiming that the Board ignored evidence that, after its contracts with the eleven utilities expire, competition will drive down the traffic available to the hypothetical carrier at current rates. Burlington Northern's evidence on this score consisted of its marketing director's estimates of the likelihood of each utility's obtaining a competitive alternative to the hypothetical carrier's service and a consultant's opinion that rates in competitive markets have declined over time. Each of these opinions, however, was rebutted by testimony from WTU's experts. Rather than ignoring its evidence, as Burlington Northern charges, the Board rejected it, finding both that the railroad did not support its marketing director's opinion with evidence of the utilities' alleged competitive options, and that Burlington Northern's consultant relied on rates paid by midwestern utilities without establishing their comparability to the southwestern markets served by the hypothetical carrier. Reviewing the competing testimony ourselves, we cannot say that the Board acted unreasonably when it rejected the estimates of Burlington Northern's experts in favor of the growth rates suggested by the railroad's own traffic report.

■ Burlington Northern also challenges the Board's acceptance of WTU's proposed 85 percent capacity utilization cap on the growth of coal shipments, correctly noting that the Board, relying on data submitted by WTU for 1994, failed to consider Burlington Northern's evidence that the utilities on the hypothetical carrier's route operated at lower average capacities in 1993. Although the Board's oversight concerns us, we think remand is unwarranted.

To begin with, Burlington Northern did not point out the overlooked evidence in its petition to reopen the proceeding, instead submitting evidence of the utilities' 1995 capacity utilization, which the Board considered but found unpersuasive. Because the new evidence, like the old evidence, showed that the eleven utilities' capacity utilization averaged below 85 percent, we doubt that the Board's analysis would have been any different had it considered the 1993 data.

■ Most important, we think substantial evidence in the record supports the Board's rejection of Burlington Northern's position that coal shipments should be capped at a level corresponding to a capacity utilization of 70 percent. According to the evidence submitted by both Burlington Northern and WTU, at least seven of the eleven utilities on the hypothetical carrier's route operated at capacities greater than 70 percent between 1993 and 1995, with several utilities operating above 80 percent. WTU itself reached 87 percent in 1994. To accept Burlington Northern's 70 percent figure as the *maximum* operating capacity achievable by the utilities over twenty years based on evidence of the utilities' current average capacity utilization, the Board would have had to assume that most utilities' coal shipments would remain flat or even decline over time, an assumption difficult to reconcile with Burlington Northern's regional traffic report, optimistic public statements from Burlington Northern officials, and the Board's expectation that a power plant's fuel efficiency declines with age. Although Burlington Northern suggested at oral argument that the Board should have split the difference between the two caps proposed by the parties, the railroad never presented this option to the Board. Because the record supports the Board's finding that coal shipments to the region were growing, and because the capacity utilization data shows that utilities do operate at levels above 80 percent, we think that the Board's use of WTU's 85–percent cap, instead of Burlington Northern's 70–percent cap, was reasonable.

■ We are equally unpersuaded by Burlington Northern's challenge to the Board's assumption that the hypothetical carrier's rates would increase at 2.8 percent annually over the analysis period, keeping pace with inflation in railroad industry costs. The

Board's treatment of future rate growth comports with the ICC's past practice in stand-alone cost cases. *See, e.g., Nevada Power,* 10 I.C.C.2d at 271 (reasonable assumption that rates increase at the rate of inflation). It also finds support in the rate escalation clauses contained in the majority of Burlington Northern's existing contracts, which the Board found provide for rate increases of between 2.2 and 4.7 percent per year, as well as in the escalation clause in WTU's expired contract, which called for annual rate hikes of 3 percent. Although Burlington Northern submitted evidence that the average rates it charged three of the utilities on the hypothetical carrier's route declined in the early 1990s, the railroad offered no explanation for the rate reductions. In at least one case, the Board determined that the reduction resulted from a switch to heavier-loading aluminum cars, a factor—the Board's counsel told us at oral argument—it accounted for elsewhere in the stand-alone cost analysis. We decline to second-guess, on the basis of two unexplained rate reductions, the Board's otherwise quite reasonable assumption that rates would remain constant in real terms. Nor do we agree with Burlington Northern that the Board improperly examined the railroad's own contracts on file with the agency in order to evaluate its claims about the level of past rate increases, particularly since Burlington Northern did not offer WTU or the Board the rate escalation letters on which those claims were based.

### Barriers to Entry

■ Under the *Coal Rate Guidelines,* costs associated with barriers to market entry and exit—costs endemic to the railroad industry—are omitted from stand-alone cost analysis in order to approximate the cost structure of a contestable market. *Coal Rate Guidelines,* 1 I.C.C.2d at 529. Here, the Board defined barriers to entry as those "costs that a new entrant must incur that were not incurred by the incumbent." *West Texas Utils. Co.,* 1996 WL 223724 at *15. Using this definition, the Board excluded from the hypothetical carrier's costs a land assemblage factor (the premium paid to purchase contiguous parcels of land) and grade-crossing costs (the expense of traversing ex-

isting roads and railroad tracks) because the record contained no evidence that Burlington Northern incurred those costs when establishing its right-of-way on the Rawhide–Oklaunion route many years ago.

We are satisfied that the Board's classification of land assemblage and grade-crossing costs was reasonable. Although " '[t]he discussion of barriers [to entry] in economic literature hardly reflects consensus,' " *West Texas Utilities Co.,* 1996 WL 223724, *15 n. 65 (quoting Harold Demsetz, *Barriers to Entry,* 72 AMERICAN ECONOMIC REVIEW 47 (1982)), prominent economists, including Burlington's own expert, define entry barriers as " 'anything that imposes an expenditure [on] a new entrant into the industry, but imposes no equivalent cost upon the incumbent.' " *Id.* at *15 n. 68 (quoting BAUMOL, PANZAR AND WILLIG, CONTESTABLE MARKETS AND THE THEORY OF INDUSTRY STRUCTURE 282 (1988)). The Board's approach is consistent with this scholarship and with the Commission's precedents, *see Coal Trading Corp. v. B & O R.R.,* 6 I.C.C.2d 361, 414 (1990) (excluding land assemblage factor and grading costs); *Coal Rate Guidelines,* 1 I.C.C.2d at 529 (entry barriers include process of buying up land), permitting Burlington Northern to earn a competitive return on all investments the railroad actually made at their current value, but not on the investments it avoided by being the first to market.

■ According to Burlington Northern, the Board's treatment of barriers to entry conflicts with the *Coal Rate Guidelines'* requirement that a stand-alone railroad's assets be valued at the cost of acquiring the assets today, not at the incumbent's historical cost. *Coal Rate Guidelines,* 1 I.C.C.2d at 544–45. We disagree. Burlington Northern's argument confuses two separate issues: whether to exclude a particular cost from the stand-alone cost analysis because it constitutes a barrier to entry, and how to value assets included in the stand-alone railroad's investment base. Because the Board concluded that land assemblage and grade-crossing costs were barriers to entry, it properly excluded them from the hypothetical carrier's capital requirements at *any* valuation.

*Discounted Cash Flow Methodology*

■ Employing a "modified perpetuity" model to evaluate the hypothetical carrier's profitability—and thereby the reasonableness of Burlington Northern's rates—the Board calculated the present value of the difference between the hypothetical carrier's estimated revenues and costs in each of its first twenty years of operations. From this, the Board concluded that total profits would exceed a reasonable return by $ 1.133 billion. Burlington Northern faults the Board for failing to extend the annual revenue and cost projections in perpetuity, arguing that the hypothetical carrier's supercompetitive profits would be partially offset by losses accruing after 2014, the last year considered in the Board's model.

Finding the Board's reliance on twenty years of estimated cash flows both reasonable and consistent with the Commission's past practice, *see Nevada Power,* 10 I.C.C.2d at 274 (using 25–year model; rejecting perpetuity model); *Coal Trading Corp.,* 6 I.C.C.2d at 428–29 (using 20–year model; rejecting perpetuity model), we defer to its choice of methodology. As the Board explained in denying Burlington Northern's petition to reopen, because the prospect of changed market conditions makes estimating financial performance in the distant future highly speculative, there is little reason to believe that incorporating such estimates into the stand-alone cost analysis—in order to account for the extremely long useful life of some railroad assets—would produce a more accurate assessment of the reasonableness of an incumbent's current rates.

Moreover, the Board reasonably concluded that Burlington Northern's perpetuity model, from which the railroad had derived a suggested rate of about $16 per ton for WTU's traffic, suffered from serious flaws of its own, including assumptions that no new power plants would be constructed after 2014 and that the hypothetical carrier would accept future operating losses rather than reduce its capital expenditures. Considering these shortcomings, the Board's decision to adhere to the Commission's modified perpetuity model, on which WTU had based its stand-alone cost presentation, struck a reasonable balance between the recognized benefits of multi-year analysis, *see Coal Rate Guidelines,* 1 I.C.C.2d at 545–46 (discussing single-period versus multi-period analysis), and the uncertainty inherent in prognostications about future market conditions.

On the whole, we find that the Board's stand-alone cost analysis reflects a rational consideration of the parties' conflicting evidence, as well as consistent and unremarkable interpretations of the Commission's *Coal Rate Guidelines.* At bottom, Burlington Northern's petition asks us to substitute our judgment for that of the Board, something we may not do. If future events prove the Board's market dominance or stand-alone cost determinations wrong, Burlington Northern can petition the Board to reconsider its rate order.

## V

■ We turn finally to Burlington Northern's claim that the Board dictated the railroad's terms of service under the rate prescribed in the Board's order. Relying on the final sentence of the Board's decision—"the service to be provided under [the new] rate must be consistent with the service parameters upon which our ... analysis is based"—Burlington Northern argues that the Board improperly preempted the railroad's right to establish its own terms of service in the first instance, subject only to later reasonableness review. *See* 49 U.S.C. § 10704(a).

We think Burlington Northern reads too much into the Board's decision on this score. The Board derived the service parameters used in its stand-alone cost analysis from Burlington Northern's existing operations or evidence supplied by the railroad. Given that nothing in the Board's inquiry focused on service terms and that its rate order contains no reference to them, we read the Board's decision, consistent with the statutory scheme, as leaving Burlington Northern free to establish reasonable terms of service under the tariff, subject to future Board review if necessary.

Having considered Burlington Northern's remaining arguments and found them without merit, we deny the petition for review.

*So ordered.*