# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued November 17, 2005     Decided February 17, 2006

No. 04-1369

PPL MONTANA, LLC,
PETITIONER

v.

SURFACE TRANSPORTATION BOARD AND
UNITED STATES OF AMERICA,
RESPONDENTS

BNSF RAILWAY COMPANY,
INTERVENOR

---

On Petition for Review of an Order of the
Surface Transportation Board

---

*John M. Cutler, Jr.* argued the cause and filed the briefs for petitioner.

*Raymond A. Atkins*, Attorney, Surface Transportation Board, argued the cause for respondent. With him on the brief were *Robert H. Pate, III*, Assistant Attorney General, U.S. Department of Justice, *Robert B. Nicholson* and *John P. Fonte*, Attorneys, *Ellen D. Hanson*, Deputy General Counsel, Surface Transportation Board, and *Thomas J. Stilling*, Attorney. *Rachel D. Campbell*, Attorney, entered an appearance.

*Richard E. Weicher*, *Michael E. Roper*, *Samuel M. Sipe, Jr.*, and *Anthony J. LaRocca* were on the brief for intervenor.

Before: GINSBURG, *Chief Judge*, and GARLAND and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: PPL Montana, LLC (PPL) filed a complaint with the Surface Transportation Board, alleging the rail rates charged by intervenor BNSF Railway Company (BNSF) were unreasonably high. The Board disagreed and dismissed the complaint. PPL now petitions for review. Finding no basis for upsetting the Board's decision, we deny the petition.

I

When a shipper files a rate complaint, *see* 49 U.S.C. §§ 10704(b), 11701, the Board is charged with determining whether the carrier targeted by the complaint has "market dominance," *id.* § 10707(b)—that is, whether there is "an absence of effective competition from other rail carriers or modes of transportation for the transportation to which a rate applies," *id.* § 10707(a).[1] If so, the carrier's rate for the captive traffic must be "reasonable." *Id.* § 10701(d)(1). If the Board determines the rate is unreasonable, *see id.* § 10707(c), it may prescribe the maximum rate that can be charged, *id.* § 10704(a)(1).

---

[1] A carrier is conclusively presumed not to have market dominance if it proves that the rate results in revenues that are less than 180 percent of the carrier's variable cost of providing the transportation. 49 U.S.C. § 10707(d)(1)(A); *see also Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 773 (D.C. Cir. 2005).

The Board determines reasonableness according to the "constrained market pricing" (CMP) principles enunciated in *Coal Rate Guidelines, Nationwide*, 1 I.C.C.2d 520 (1985) (*Guidelines*), *aff'd sub nom. Consol. Rail Corp. v. United States*, 812 F.2d 1444 (3d Cir. 1987).[2] *Guidelines* indicates that CMP meets the Board's "dual objectives of providing railroads the real prospect of attaining revenue adequacy while protecting captive coal shippers from 'monopolistic' pricing practices." *Id.* at 524-25. CMP consists of three main constraints on a railroad's rates: revenue adequacy, management efficiency, and stand-alone cost (SAC). *Id.* at 534-46.

A SAC analysis seeks to determine the lowest cost at which a hypothetical efficient carrier could provide service to the complaining shipper or a group of shippers that benefits from sharing joint and common costs. *Id.* at 528; *see also id.* at 529 ("The stand-alone cost, as we define it here, approximates the full economic costs, including a normal profit, that need to be met for an efficient producer to provide service to the shipper(s) identified."). The Board assumes away barriers to entry and exit so as to treat the otherwise non-competitive railroad industry as a contestable market. *Id.* at 528-29. Under the SAC constraint, then, the rate at issue can be no higher than what the hypothetical carrier would have to charge to provide the needed service while fully covering its costs, including a reasonable return on investment. *Id.* at 528-29, 542-43. In this way, under the Board's watchful eye,

> railroads functioning in a noncompetitive market will be required to price as if alternatives to their services were available. That is, their rates will be judged against simu-

[2] The Board's predecessor, the Interstate Commerce Commission, was abolished by the ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803. *See N.Y. Cross Harbor R.R. v. Surface Transp. Bd.*, 374 F.3d 1177, 1179 n.2 (D.C. Cir. 2004).

lated competitive prices. As a result, the efficiencies of a contestable market will serve as the guide for establishing maximum rates on captive coal traffic.

*Id*. at 542. The SAC test is a means to insure that a captive shipper does "not bear the costs of any facilities or services from which it derives no benefit." *Id.* at 523; *see id.* at 528.

To proceed under the SAC constraint, a complaining shipper designs and presents to the Board a hypothetical stand-alone railroad (SARR) to serve the traffic group; the traffic group may contain both the complaining shipper's traffic—the issue traffic—as well as other traffic selected to take advantage of the "benefits of any inherent production economies." *Id.* at 543-44; *see also, e.g.*, *McCarty Farms, Inc. v. Burlington N., Inc.*, 2 S.T.B. 460, 466-67 (1997). The ability to group traffic of different shippers is "essential" to the theory of contestability. *Guidelines*, 1 I.C.C.2d at 544. As the Board has not seen a need to set general restrictions on the "traffic that may potentially be included in a stand-alone group," *id.*, a complainant is afforded flexibility in selecting a traffic group for its SARR, *see, e.g.*, *Ariz. Pub. Serv. Co. v. Atchison, Topeka & Santa Fe Ry. Co.*, 2 S.T.B. 367, 381 (1997) ("In a SAC analysis, the complaining shipper may select any subset of available traffic to determine the least cost at which that subset of traffic could be served independently of other traffic."). Nevertheless, the potential traffic draw is "open to scrutiny in individual cases," and "[t]he proponent of a particular stand-alone model must identify, and be prepared to defend, the assumptions and selections it has made." *Guidelines*, 1 I.C.C.2d at 544. The Board then compares the SARR's costs to the revenues the SARR can expect from the traffic group; if the latter is greater, the Board can conclude the challenged rate levels are too high. *See, e.g.*, *McCarty Farms*, 2 S.T.B. at 467.

II

PPL ships coal by rail via BNSF from mines in Wyoming's Powder River Basin to PPL's Corette generating facility at Billings, Montana. In July 2000, PPL filed a complaint with the Board, challenging the reasonableness of the rail rates charged by BNSF.

PPL invoked the SAC constraint and, accordingly, proffered a SARR that can be viewed as consisting of two segments: a high-density "north-south" segment and a low-density "western" segment. The north-south segment, extending south from Buckskin, Wyoming—through Campbell—to Converse, Wyoming, was used to originate coal in the Powder River Basin. The longer western segment, branching off the north-south segment at Campbell, extended westward out of the Powder River Basin for more than 200 miles to PPL's plant in Billings and to other Montana locations. All of the traffic PPL included in the SARR, with the exception of PPL's own traffic, is "cross-over" traffic, which originates or terminates on the residual real-world railroad and is interchanged with the SARR. Most of the cross-over traffic moved no more than 26 miles on the north-south segment.

BNSF challenged PPL's SAC presentation, arguing, in relevant part, that "PPL has impermissibly cross-subsidized the issue traffic (and other traffic [traveling on the western segment]) as a result of the exorbitant revenues that are assumed to be earned by a subset of its cross-over traffic." Joint Appendix ("J.A.") 14. To demonstrate this cross-subsidy, BNSF calculated revenues from cross-over traffic that used only the north-south segment to be far in excess of the stand-alone cost of the north-south segment.

PPL recognized that BNSF was advocating a rule, in part, "designed to exclude the possibility that non-issue traffic on the SARR is subsidizing issue traffic." *Id*. at 61. Discounting such

concerns, PPL suggested the SAC test only prevented the complaining shipper from being forced to subsidize other traffic, and that the complaining shipper was free to design a SARR in which other traffic subsidized the complaining shipper. Nonetheless, in the event the Board was troubled by such cross-subsidies, PPL offered an alternative to examining the revenues and SAC of the north-south segment:

> Assuming [cross-subsidization of the issue traffic by non-issue traffic] is a legitimate concern . . ., there is a more direct test for cross subsidy that would not impose prohibitive litigation burdens and expenses on complainants. *Traffic that is covering its attributable cost is not being subsidized*. This test has been met both for the issue traffic and for the cross-over traffic . . . .

*Id.* (emphasis added).

The Board *did* consider cross-subsidization of the issue traffic to be a legitimate concern, observing that "PPL's contention that non-issue traffic may be used to cross-subsidize the complaining shipper's rate is inconsistent with CMP principles." *PPL Montana, LLC v. Burlington N. & Santa Fe Ry. Co.*, STB Docket No. 42054, Dec. No. 31155, 2002 WL 1905118, at *5 (Aug. 19, 2002) (*Decision I*). The Board explained that "PPL does not adequately distinguish between cost sharing (the grouping of traffic to share the joint and common, i.e., unattributable, costs of providing rail service), which *Guidelines* permits, and cross-subsidization (the recovery of a shipper's attributable costs from other shippers), which *Guidelines* proscribes." *Id.* (footnote omitted). While the Board rejected BNSF's alternative (i.e., an inquiry into whether the north-south traffic generated revenues in excess of SAC), *id.* at *5 & nn.19-20, the Board determined the real issue was "whether there is a readily identifiable subset of traffic that would not cover the collective attributable costs associated with serving the traffic," *id.* at *5.

Thus, the Board conducted a threshold cross-subsidy inquiry to determine "whether the western leg of the [SARR] would earn sufficient revenues to cover its attributable costs or whether it would require a cross-subsidy in order to be viable over the 20-year analysis period." *Id.* The Board accepted "the majority of the evidence submitted by PPL regarding the operations and construction of the western segment," *id.*, and credited to the western segment the revenues of all traffic that used any *portion* of the western segment, *id.* at *6. Nonetheless, the Board concluded the western segment would still "not be self-sustaining," *id.* at *5, as its attributable costs outstripped its revenues by $9.26 million, *id.* at *7. Accordingly, because PPL had "failed to show that the rates charged by BNSF for transporting coal traffic to the Corette power plant are unreasonably high," *id.*, the Board dismissed PPL's complaint.

PPL moved for reconsideration, contending, *inter alia*, that it should be allowed to revise its evidentiary presentation to comport with the Board's threshold cross-subsidy test. However, the Board ultimately declined to revive PPL's complaint. *See PPL Montana, LLC v. Burlington N. & Santa Fe Ry. Co.*, STB Docket No. 42054, Dec. No. 33265, 2003 WL 1474407 (Mar. 21, 2003) (*Decision II*) (reopening proceedings only for limited purpose of recalculating expenses on western segment and otherwise denying reconsideration), *reconsideration denied*, Dec. No. 33783, 2003 WL 21501898 (June 27, 2003) (*Decision III*), *and on reconsideration*, Dec. No. 34579, 2004 WL 1926886 (Aug. 30, 2004) (*Decision IV*) (recalculating expenses and adhering to original disposition).

PPL petitions for review.

### III

We will set aside a Board decision only if it is "arbitrary, capricious, an abuse of discretion, . . . otherwise [unlawful, or] . . . unsupported by substantial evidence." 5 U.S.C. § 706(2)(A),

(E); *see Burlington N. R.R. v. Surface Transp. Bd.*, 114 F.3d 206, 210 (D.C. Cir. 1997). In ascertaining whether a railroad's rate is reasonable, the Board is at the "zenith of its powers" and thus entitled to "particular deference." *Burlington N. R.R.*, 114 F.3d at 210 (internal quotation marks and citations omitted). Where the Board's findings rest on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and where the Board has articulated a "rational connection between the facts found and the decision made," we will not disturb its judgment. *Id.* (internal quotation marks, citations, and brackets omitted). In dealing with complex matters within its expertise, the Board has "wide discretion in formulating appropriate solutions." *Sec'y of Agric. v. United States*, 347 U.S. 645, 652 (1954); *see also Guidelines*, 1 I.C.C.2d at 525 (noting that "CMP is based on rather sophisticated economic theories which require careful interpretation and application"). We are not empowered to substitute our judgment for that of the Board. *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 849 (D.C. Cir. 1987); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

PPL contends the Board's reliance on its threshold cross-subsidy test to reject PPL's complaint is inconsistent with *Guidelines*; that it represents a departure from Board precedent without proper explanation or notice; and that the Board should have reopened the proceeding to allow PPL to adjust its SARR presentation. We are not persuaded.

The Board's application of its cross-subsidy test is neither arbitrary nor capricious but rather a reasonable interpretation of the principles articulated in *Guidelines*. *See High Plains Wireless, L.P. v. FCC*, 276 F.3d 599, 606 (D.C. Cir. 2002) (stating that an agency's interpretation of its own rule is given "controlling weight unless it is plainly erroneous or inconsistent with the regulation" (internal quotation marks and citation omitted)); *see also CMC Real Estate Corp. v. ICC*, 807 F.2d

1025, 1034 (D.C. Cir. 1986) ("It is well established that an agency's interpretation of the intended effect of its own orders is controlling unless clearly erroneous."). *Guidelines* explains the SAC test is a means of assuring that a "captive shipper should not bear the costs of any facilities or services from which it derives no benefit." 1 I.C.C.2d at 523. The Board reasonably extrapolated from this that a basic principle of *Guidelines*, and the primary purpose of the SAC test, is to guard against "both cross-subsidization by and cross-subsidization of the captive issue traffic" when determining the reasonableness of the issue traffic's rates. *Decision I*, 2002 WL 1905118, at *5. As previously described, the SAC test, rooted in the concept of contestable markets, "is used to compute the rate a competitor in the market-place would need to charge in serving a captive shipper or a group of shippers who benefit from sharing joint and common costs." *Guidelines*, 1 I.C.C.2d at 528. In a contestable market, a competitor would always enter the market to compete for, and charge a lower price for, any traffic that is subsidizing other traffic on the line. Therefore, just as a "captive shipper should not bear the costs of any facilities or services from which it derives no benefit," *id.* at 523, it was not unreasonable for the Board to require the captive shipper in this case to hypothesize its SARR in accordance with the same standard—i.e., the viability of the western segment (including the issue traffic) could not depend on a cross-subsidy. Faced with PPL's SARR, the Board's decision advances the reasonable proposition that the captive issue traffic cannot be improperly subsidizing other traffic if the issue traffic cannot even cover its own attributable costs; in other words, it is difficult to steal from a penniless Peter to pay Paul. Thus, the Board's threshold cross-subsidy inquiry sought to determine whether the western segment of the SARR would be "self-sustaining," *Decision I*, 2002 WL 1905118, at *5; answering in the negative, the Board saw no danger of the issue traffic subsidizing other traffic, perceiving

instead that the western segment's survival relied on subsidies *from* other traffic.[3]

PPL's argument that its SARR would charge lower rates to all of its customers than they currently pay the incumbent railroad misses the mark. *See* Petitioner's Br. at 21 ("So long as the SARR as a *whole* covers its attributable and unattributable costs while charging lower rail rates than its shipper customers would otherwise pay, there is no cross-subsidy."). While BNSF may be charging excessive rates to non-issue traffic on a different section of the line, that does not mean the Board must permit any (or every) captive shipper (such as PPL) to obtain on its own section of the line a rate reduction even though the current rate is already insufficient to cover its attributable costs. If other shippers are being overcharged, they may bring their own challenges. It is of no moment that a full-fledged SAC analysis might normally proceed by comparing the costs and revenues of the SARR as a whole; the Board's cross-subsidy test acts as a *threshold* inquiry, reasonably allowing the Board to halt the SAC analysis in its tracks.[4]

Further, we perceive no inconsistency with post-*Guidelines* Board precedent. While an agency changing course must supply a reasoned explanation, *see, e.g.*, *Motor Vehicle Mfrs. Ass'n v.*

---

[3] PPL's contention that the Board "does not have jurisdiction over, or any statutory obligation to protect from abuse, whether in the form of cross-subsidization or in any other form, the traffic and rates of non-complaining shippers," Petitioner's Br. at 22, is unavailing, as the Board here *has* remained focused on the issue traffic in determining that the western segment's inability to cover its own attributable costs allows the Board to end the analysis.

[4] PPL's attack on the Board's calculation of the western segment's costs, *see Decision IV*, 2004 WL 1926886, at *3-6, lacks merit; the Board proceeded reasonably and its calculations were supported by substantial evidence.

*State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983); *Sec'y of Agric.*, 347 U.S. at 653; *N.Y. Cross Harbor R.R. v. Surface Transp. Bd.*, 374 F.3d 1177, 1181 (D.C. Cir. 2004); *Ramaprakash v. FAA*, 346 F.3d 1121, 1124 (D.C. Cir. 2003); *Hatch v. FERC*, 654 F.2d 825, 834-35 (D.C. Cir. 1981), the present case represents no such abrupt departure. In none of the cases pointed to by PPL, *see Ariz. Pub. Serv. Co.*, 2 S.T.B. 367; *Rate Guidelines—Non-Coal Proceedings*, 1 S.T.B. 1004 (1996); *W. Tex. Utils. Co. v. Burlington N. R.R. Co.*, 1 S.T.B. 638 (1996); *Bituminous Coal—Hiawatha, Utah, to Moapa, Nev.*, 10 I.C.C.2d 259 (1994); *Bituminous Coal—Hiawatha, Utah, to Moapa, Nev.*, 6 I.C.C.2d 1 (1989); *Metro. Edison Co. v. Conrail*, 5 I.C.C.2d 385 (1989); *McCarty Farms v. Burlington N. Inc.*, 4 I.C.C.2d 262 (1988); *Omaha Pub. Power Dist. v. Burlington N. R.R. Co.*, 3 I.C.C.2d 853 (1987), did the Board (or its predecessor) "expressly" speak to the "precise issue" in the present case. *So. Cal. Edison Co. v. FERC*, 805 F.2d 1068, 1071 (D.C. Cir. 1986). That is, in the cited cases, the Board never indicated that, in the course of fulfilling its statutorily assigned role in policing the reasonableness of captive shippers' rates, it would tolerate a SARR presentation—which is itself a Board construct—wherein the issue traffic depended on a cross-subsidy. In any case, the Board itself distinguished a number of its prior cases, *see Decision II*, 2003 WL 1474407, at *4 n.20, and we afford deference to that effort. *See Inland Lakes Mgmt., Inc. v. NLRB*, 987 F.2d 799, 805 (D.C. Cir. 1993) ("[T]he [agency's] attempt to distinguish its prior cases, while terse, is entitled to deference."); *cf. N.Y. Cross Harbor R.R.*, 374 F.3d at 1183 (faulting Board for failing to distinguish case from "uniform" precedent and providing no reasoned explanation of why it ignored "factors and reasoning it has previously—and consistently—found controlling"). In short, agency precedent poses no barrier to the Board's decision in the present case.

In turn, PPL's argument that the Board failed to give adequate notice of its cross-subsidy test is unavailing. Regard-

less of whatever notice is due before an agency "reverse[s] a policy that had been the subject of reasonable reliance," *Williams Natural Gas Co. v. FERC*, 3 F.3d 1544, 1555 (D.C. Cir. 1993) (internal quotation marks and citation omitted), notice is not required before every clarification or extension of an agency's principles to novel scenarios, *see So. Cal. Edison*, 805 F.2d at 1071 & n.4. Moreover, BNSF argued—and PPL responded to the argument—that "PPL ha[d] impermissibly cross-subsidized the issue traffic." *See* J.A. 14, 61. Even though the Board ultimately rejected BNSF's reasoning as to how that cross-subsidy came about—through allocating "exorbitant revenues . . . [to] a subset of [the SARR's] cross-over traffic," *id.* at 14—the objection was raised and the rationale for rejecting cross-subsidies in this case is sound without respect to the cause of the cross-subsidization.

Finally, the Board did not abuse its discretion in rejecting PPL's request to reopen the proceeding so PPL could alter the traffic pattern on its SARR in light of the Board's cross-subsidy test. *See E. Carolinas Broad. Co. v. FCC*, 762 F.2d 95, 103 (D.C. Cir. 1985) (noting that we "normally reverse an agency's decision not to reopen the record only for abuse of discretion"); *see also Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 296 (1974); *Advanced Commc'ns Corp. v. FCC*, 376 F.3d 1153, 1156-58 (D.C. Cir. 2004); *Omaha Pub. Power Dist.*, 3 I.C.C.2d at 862. PPL, having the responsibility to engineer a SARR and present it to the Board in the first instance, cannot seek to modify it simply because the Board finds that SARR unacceptable based on a reasonable application of the *Guidelines* principles. As the Board noted, were it "to allow a disappointed party to revise its case in response to [the Board's] rulings, there could be no end to an administrative proceeding." *Decision II*, 2003 WL 1474407, at *7.

13

IV

For the foregoing reasons, the petition for review is

*Denied.*