# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 13, 2006           Decided July 18, 2006

No. 05-1136

ARIZONA ELECTRIC POWER COOPERATIVE, INC.,
PETITIONER

v.

SURFACE TRANSPORTATION BOARD AND
UNITED STATES OF AMERICA,
RESPONDENTS

BNSF RAILWAY COMPANY AND
UNION PACIFIC RAILROAD COMPANY,
INTERVENORS

On Petition for Review of an Order of the
Surface Transportation Board

*William L. Slover* argued the cause for the petitioner. *Robert D. Rosenberg* and *Andrew B. Kolesar, III* were on brief.

*Thomas J. Stilling*, Attorney, Surface Transportation Board, argued the cause for the respondent. *Thomas O. Barnett*, Acting Assistant Attorney General, and *Robert B. Nicholson* and *John P. Fonte*, Attorneys, United States Department of Justice, and *Ellen D. Hanson*, General Counsel, and *Rachel Danish Campbell*, Attorney, Surface Transportation Board, were on brief.

*Carolyn F. Corwin*, *David L. Meyer*, *Michael L. Rosenthal*, *J. Michael Hemmer*, *Louise A. Rinn*, *Samuel M. Sipe, Jr.*, *Anthony J. LaRocca*, *Richard E. Weicher* and *Michael E. Roper* were on brief for the intervenors. *Alice E. Loughran* entered an appearance.

Before: HENDERSON and GARLAND, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Petitioner Arizona Electric Power Cooperative (AEPCO) seeks review of a decision of the Surface Transportation Board (STB or Board) dismissing AEPCO's challenge to the joint rate charged by the Burlington Northern Santa Fe Railroad (BNSF) and the Union Pacific Railroad (UP) (collectively Railroads) to transport coal from mines in North Tipple and Lee Ranch, New Mexico (New Mexico mines), near Defiance, New Mexico, to AEPCO's Apache power plant in Cochise, Arizona. Using the STB's "Stand Alone Cost" (SAC) methodology, AEPCO hypothesized the costs an imaginary "Stand-Alone Railroad" (SARR) would incur in shipping the coal from the same origin point to the same destination as the Railroads but using an alternative route. AEPCO's hypothetical SARR cost was substantially lower than the Railroads' joint rate, in large part because it relied on the trackage rights BNSF held over a segment of track owned by UP. The Board rejected AEPCO's SAC analysis on the ground that a shipper hypothesizing costs in a joint rate case may not rely on the trackage rights that one defendant railroad (here BNSF) holds over track belonging to a second defendant railroad (here UP) because the trackage rights fee does not fully reflect the *joint* costs of the two defendant Railroads, including the costs of building and maintaining the track. Because the Board's decision was not arbitrary or capricious, we deny the petition for review.

**I.**

On December 29, 2000 AEPCO filed a complaint challenging as unreasonably high the joint rates the Railroads charged AEPCO to transport coal from the New Mexico mines to AEPCO's Cochise, Arizona power plant. On March 9, 2001 AEPCO filed an amended complaint to challenge in addition the joint rates the Railroads charged to transport coal from mines in the Powder River Basin (PRB) of Wyoming and Montana and the single-line rates UP charged for transport from mines in Colorado. To support its challenges AEPCO relied on a SAC analysis. As we recently explained:

> A SAC analysis seeks to determine the lowest cost at which a hypothetical efficient carrier could provide service to the complaining shipper or a group of shippers that benefits from sharing joint and common costs. The Board assumes away barriers to entry and exit so as to treat the otherwise non-competitive railroad industry as a contestable market. Under the SAC constraint, then, the rate at issue can be no higher than what the hypothetical carrier would have to charge to provide the needed service while fully covering its costs, including a reasonable return on investment.

*PPL Mont., LLC v. STB*, 437 F.3d 1240, 1242 (D.C. Cir. 2006) (internal citations omitted); *see generally Coal Rate Guidelines, Nationwide*, 1 I.C.C.2d 520 (1985) (*Guidelines*), *aff'd sub nom. Consol. Rail Corp. v. United States*, 812 F.2d 1444 (3d Cir. 1987).

On February 15, 2002 the Railroads filed a "Petition for an Order Requiring Separate Evidentiary Submissions for Each Rate Challenged by AEPCO," contending AEPCO was "engaged in an effort to manipulate the Board's SAC procedures" by "attempting to include in its stand-alone railroad the vast revenues from Powder River Basis shipments that never touch the routes of the Colorado and New Mexico traffic."

Joint App. (JA) 276. In a decision served August 20, 2002 (*AEPCO I*), 2002 WL 1905116, the STB offered its "guidance on the permissible parameters of a SAC presentation in these circumstances." *AEPCO I* at 1-2. The Board advised that (1) AEPCO could assume a different route for the New Mexico mines from the one the Railroads had been jointly using, *id.* at 6; (2) AEPCO could not propose joint service for the Colorado shipping because the shipping was done under a single rate by UP alone, *id.*; (3) AEPCO could not rely on non-UP traffic (which would not produce revenues to UP) to reduce the cost of the single-rate UP Colorado transport, *id.*; and—most significant here—(4) "where UP has cost-sharing arrangements in place with BNSF (for example, joint ownership of a line-segment or trackage rights arrangements)"—as, the Board noted, UP enjoyed over three segments of the Colorado route belonging to BNSF—"[i]n designing a SARR to replicate UP's single-line service, AEPCO may assume these same economies," *id.* at 7. The Board elaborated:

> These guiding principles—that a SARR may replicate the existing cost-sharing arrangements but may not hypothesize non-existent revenue or cost-sharing arrangements—apply with equal force to SARRs designed to test the BNSF-UP joint rates from the PRB and New Mexico origins. Thus, for each segment of a route used to test the respective joint rates, only the traffic and revenues of the carrier whose portion of the route is being replicated should be included in the SARR's traffic group. But the SARR may be assumed to have the same cost-sharing arrangements as the defendant carriers have on each segment, so long as the terms of those arrangements (including operational provisions and terms of compensation) are the same as those applicable to the defendant carriers.

*Id.*

On February 5, 2003 AEPCO advised the STB that it had reached a settlement with UP regarding the Colorado and the PRB rates, leaving in dispute only the shipping rates from the New Mexico mines to the Cochise, Arizona power plant. AEPCO filed its opening evidence on these rates on February 7, 2003, hypothesizing a SARR (the "Apache, Cochise & Eastern Railroad") that used a different—and longer—route than did the Railroads. The Railroads' route ran east on BNSF's track from Defiance, New Mexico to Belen Junction, New Mexico, then south on BNSF's track (through Rincon, New Mexico) to Deming, New Mexico, and finally west on UP's track to Cochise, Arizona; AEPCO's hypothetical route ran east on BNSF's track from Defiance, New Mexico (past Belen Junction, New Mexico) to Vaughn, New Mexico, then south on UP's track (over which BNSF had trackage rights) from Vaughn, New Mexico to El Paso, Texas, then west on UP's track running south of Deming, New Mexico to Cochise, Arizona. To establish its SARR shipping costs for the two east-west segments, AEPCO submitted evidence of the actual costs of building and maintaining the segments; for the north-south segment from Vaughn, New Mexico to El Paso Texas, however, AEPCO assumed it would pay BNSF's trackage rights fee over UP's track, which was 3.2 mills per gross ton-mile (GTM).

On April 18, 2003 UP filed a petition requesting the Board alternatively either to require AEPCO to submit new evidence or to dismiss AEPCO's complaint, specifically objecting to AEPCO's reliance on BNSF's trackage rights because payment of the trackage rights fee alone would not replicate the "*total* costs" of traffic which "UP and BNSF together incur." JA 340-41 (emphasis original). In rebuttal, AEPCO submitted, inter alia, evidence to support the 3.2-mill/GTM rate.

In a decision served November 19, 2003 (*AEPCO II*), 2003 WL 22717853, the STB rejected AEPCO's trackage rights fee assumption, concluding that "using [cost-sharing or cost-saving]

arrangements between joint-rate defendants to avoid a significant portion of the capital costs of providing service would defeat the SAC test assumption" because "the SAC test could not serve its purpose if the SAC analysis failed to take into account the full costs of providing and maintaining the physical plant needed to serve the traffic—costs which the joint-rate defendants collectively must bear." *AEPCO II* at 6. The Board determined "[i]t would not be appropriate, however, to dismiss AEPCO's case on this ground, in view of the Board's statements in [*AEPCO I*]"—about taking into account cost-saving arrangements such as trackage rights in calculating the costs of SARR routes from the "New Mexico origins," *AEPCO I* at 7—and "the expectations that may have been created" by the statements, *AEPCO II* at 6. The Board then advised AEPCO it "w[ould] be allowed to rely on its rebuttal SAC presentation as its case-in-chief, if it d[id] not wish to prepare a new case-in-chief." *Id*. If AEPCO chose to rely on its rebuttal evidence, the Board advised, the Railroads "w[ould] be entitled to demonstrate the inadequacy (for purposes of the SAC analysis) of the usage fee reflected in the existing BNSF-UP trackage rights agreement and to show the level at which a usage fee would need to be set to satisfy the objectives of the SAC test." *Id*. AEPCO "would then have an opportunity to present rebuttal evidence on that issue." *Id*.

In response to *AEPCO II*, AEPCO informed the Board on November 26, 2003 that it intended to "rely on its previously-filed evidence" rather than submit a new case-in-chief. JA 156. On January 26, 2004 the Railroads filed a supplemental evidentiary response, arguing, inter alia, that "the trackage rights fee AEPCO use[d] in its evidence would be inadequate to cover the full costs of providing service between Vaughn and El Paso." JA 462. AEPCO responded on April 12, 2004 with supplemental rebuttal evidence, asserting that the 3.2-mill/GTM fee was appropriate because Southern Pacific Transportation Company (UP's predecessor on the track segment) had

voluntarily agreed to the fee in 1995 when it dropped its opposition to the merger of Burlington Northern and Santa Fe Railroads (BNSF's predecessors) and because in the subsequent UP/Southern Pacific Transportation Company merger proceeding, both parties "offered a very vigorous defense of the reasonableness of the 'nearly identical' trackage rights fee," JA 520. AEPCO also submitted alternative trackage rights fees of 8.32 mills/GTM and 9.05 mills/GTM.

In a decision served March 15, 2005 (*AEPCO III*), 2005 WL 638319, the STB dismissed AEPCO's complaint on the merits, concluding: "[W]e cannot complete a rate reasonableness analysis in this case because AEPCO, which chose to contest the reasonableness of the challenged rates using the Board's stand-alone cost (SAC) test, presented an incomplete SAC case and, even when afforded the opportunity to provide a more complete case, failed to do so." *AEPCO III* at 1. Specifically, the Board found that "AEPCO did not provide either evidence of the costs of constructing and maintaining the Vaughn-to-El Paso line or evidence to link the trackage rights fee to stand-alone costs." *Id*. at 15.

With regard to trackage rights, the Board acknowledged that "[c]omplainants in rail rate cases have long been permitted to hypothesize a SARR that would utilize trackage rights over another railroad's line for a portion of the route where those trackage rights have replicated how the defendant railroad was actually moving the issue traffic, and where the line has belonged to a third-party, i.e., a railroad that was not a defendant in that rate case." *AEPCO III* at 10. The Board distinguished this case, however, on the ground that AEPCO sought to rely on trackage rights over a co-defendant railroad's track, explaining that "[b]ecause it is the collective revenue requirements of UP and BNSF that are being tested, all necessary costs of providing facilities for the Vaughn-to-El Paso portion of the joint line movement must be taken into account." *Id*. at 11. The Board

advised that, although it would "not completely close the door on using trackage rights as part of a SARR," "the fee must reflect the full costs of assembling and operating the essential facilities required to provide the service" and that AEPCO had not demonstrated its proposed trackage rights fees did so. *Id.*

AEPCO filed a timely petition for review of *AEPCO III*.

**II.**

We recently set out the standard for reviewing a rate decision by the Board:

> We will set aside a Board decision only if it is "arbitrary, capricious, an abuse of discretion, . . . otherwise [unlawful, or] . . . unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E); *see Burlington N. R.R. v. Surface Transp. Bd.,* 114 F.3d 206, 210 (D.C. Cir. 1997). In ascertaining whether a railroad's rate is reasonable, the Board is at the "zenith of its powers" and thus entitled to "particular deference." *Burlington N. R.R.,* 114 F.3d at 210 (internal quotation marks and citations omitted).

*PPL Mont., LLC*, 437 F.3d at 1244-45 (alterations in original). AEPCO offers three grounds for setting aside *AEPCO III*. We conclude that none of them meets the stringent criteria of our highly deferential review standard.

First, AEPCO contends the Board impermissibly deviated from past decisions of the STB and of its predecessor the Interstate Commerce Commission (ICC),[*] including *AEPCO I*, when it rejected AEPCO's reliance on BNSF's trackage rights over UP's Vaughn-to-El Paso segment. *See N.Y. Cross Harbor*

---

[*] The ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803, abolished the ICC, created the STB, transferred the ICC's remaining regulatory authority to it and provided that ICC precedent applies to the STB.

*R.R. v. STB*, 374 F.3d 1177, 1181 (D.C. Cir. 2004) ("An agency acts arbitrarily and capriciously if it 'reverse[s] its position in the face of a precedent it has not persuasively distinguished.' " (quoting *La. Pub. Serv. Comm'n v. FERC*, 184 F.3d 892, 897 (D.C. Cir. 1999) (alteration in original)). We conclude the STB persuasively distinguished its treatment of trackage rights here from other Board decisions.

In all of the previous decisions AEPCO cites, the trackage rights lay over track belonging to a non-defendant third party railroad and not, as here, over track belonging to a co-defendant railroad sharing a joint rate. *See* Opening Br. 25-27 (citing *Bituminous Coal–Hiawatha, Utah, to Moapa, Nev.*, 1 I.C.C.2d 1, 54-55 (1989); *W. Tex. Utils. Co.*, 1 S.T.B. 638, 684 (1996); *Wis. Power & Light Co.*, 2001 WL 1075821, at *28 & n.120 (served Sept. 13, 2001); *Tex. Mun. Power Agency*, 2003 WL 1523335, at *5 n.21 (served Mar. 24, 2003)). The Board's discussion of trackage rights in *AEPCO I* likewise addressed single line trackage rights. There the Board authorized AEPCO to "assume the[] same economies" that UP enjoys—such as "joint ownership of a line-segment or trackage rights arrangements"—"[i]n designing a SARR to replicate UP's *single-line* service" in Colorado. *AEPCO I* at 7 (emphasis added). It is true the Board acknowledged that "the[] same guiding principles—that a SARR may replicate the existing cost-sharing arrangements but may not hypothesize non-existent revenue or cost-sharing arrangements—apply with equal force to SARRs designed to test the BNSF-UP joint rates from the PRB and New Mexico origins," *id.*, but it did not state that they would apply if the trackage rights run over a joint rate co-defendant's track. In contrast to the situation addressed in *AEPCO I* and in previous precedent, in *AEPCO III* the Board was "presented . . . with novel issues of reliance in a SAC presentation on trackage rights over a *co-defendant* carrier,"*AEPCO III* at 11 (emphasis added). Thus, "[i]n none of the cases pointed to by [AEPCO], did the Board (or its

predecessor) 'expressly' speak to the 'precise issue' in the present case." *PPL Mont., LLC*, 437 F.3d at 1246 (quoting *Cal. Edison Co. v. FERC,* 805 F.2d 1068, 1071 (D.C. Cir. 1986)) (internal citations omitted). We therefore conclude that this case is reasonably distinguishable from Board precedent governing single-line trackage rights.

Second, AEPCO asserts the Board's decision in *AEPCO III* should be accorded no deference because it is the product of an unfair procedure. AEPCO complains that in *AEPCO II* the Board purported to offer it the option to either rely on its previous evidence, which incorporated BNSF's 3.2 mill/GTM trackage rights fee, or file a new case-in-chief but that the Board in fact "had already made up its mind that only new construction costs would suffice." Opening Br. 33. We perceive no unfairness in the Board's procedure—quite the opposite. In *AEPCO II* the Board plainly stated that "using [cost-sharing or cost-saving] arrangements between joint-rate defendants to avoid a significant portion of the capital costs of providing service would defeat the SAC test." *AEPCO II* at 6. Nonetheless, out of concern that language in *AEPCO I* might have given AEPCO a false impression about the appropriateness of trackage rights fees, the Board offered AEPCO a second opportunity to make its case—either by submitting an entirely new case-in-chief that did not rely on the suspect trackage rights fee or, alternatively, by relying for its case-in-chief on its previously submitted rebuttal evidence supporting the 3.2 mill/GTM rate. At the same time, however, the Board made clear that, in its view, there was "good cause to believe that the existing usage fee would not be adequate to reflect the full SAC costs of providing service over the Vaughn-to-El Paso line segment," *id*. (citing *Union Pacific/Southern Pacific Merger*, 1 S.T.B. 233, 415 & n.168 (1996)), and warned that "if AEPCO cho[se] to rely on its rebuttal SAC evidence, the defendants w[ould] be entitled to demonstrate the inadequacy (for purposes of the SAC analysis) of the usage fee reflected in the existing

BNSF-UP trackage rights agreement and to show the level at which a usage fee would need to be set to satisfy the objectives of the SAC test," *id*. When AEPCO declined the invitation to submit a new case and, notwithstanding the Board's contrary warnings and advice, opted to stick by the 3.2 mill/GTM rate, it did so at its own peril and cannot now reasonably complain of surprise at the outcome or of unfairness in the process.

Third, AEPCO contends the Board's "new rule," Opening Br. 34—foreclosing reliance on a defendant railroad's trackage rights over a co-defendant's tracks—is arbitrary and capricious because it violates SAC's "core notion," "that the SARR is the mechanism to determine the price that would result if the market were competitive, that is, free from barriers and exit." *Id*. 35. Under SAC principles, AEPCO argues, the SARR must be entitled to "the same production technique as the incumbent," including the discounted trackage rights fee that BNSF enjoys. We disagree. As the Board explained in *AEPCO III*, in past cases "use of trackage rights was allowed in the SAC analysis because the third-party carrier was not responsible for providing the service and the revenue requirements of the third-party carrier were not at issue in the rate case," stressing that "allowing the SARR to have the benefit of the same trackage rights arrangement as the defendant railroad uses to move the traffic involved, at the same trackage rights fee, is necessary for the SARR to 'stand in the shoes' of the defendant." *AEPCO III* at 10. The Board rationally explained in *AEPCO III*, however, that "the usual trackage rights fee arrangement, in which the tenant carrier's fee does not reflect the full cost of ownership, would not be appropriate" for the Vaughn-to-El Paso segment because "it is the collective revenue requirements of UP and BNSF that are being tested" and therefore "all necessary costs of providing facilities for the Vaughn-to-El Paso portion of the joint line movement must be taken into account." *AEPCO III* at 11. The Board reasonably concluded that the SARR rate should include UP's costs in building and maintaining the Vaughn-to-El

Paso track and "[w]e are not empowered to substitute our judgment for that of the Board." *PPL Mont., LLC*, 437 F.3d at 1245 (citing *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 849 (D.C. Cir. 1987); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

For the foregoing reasons, AEPCO's petition for review is denied.

*So ordered*.